Sandra TURNER; Debra Scruggs; Jerrylean Baker; and California Coalition of Welfare Rights Organizations; on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Marion J. WOODS, individually and in his official capacity as the Executive Director of the Department of Social Services of the State of California; Kyle McKinsey, individually and in his official capacity as Deputy Director of the Department of Social Services of the State of California; Department of Social Services of the State of California; Mary Ann Graves, individually and in her capacity as Director of the Department of Finance of the State of California; and the Department of Finance of the State of California, Defendants.

No. C 81-4457 TEH.

United States District Court, N.D. California.

July 29, 1982.

Motions for Reconsideration, Stay Pending Appeal and Civil Contempt Oct. 6, 1982.

Order Prohibiting Recoupment Oct. 15, 1982.

Mark N. Aaronson, S.F. Lawyers' Committee for Urban Affairs, Steven A. Lewis, Diane A. King, John E. Peer, Guy Calladine, Long & Levit, San Francisco, Cal., for plaintiffs.

George Deukmejian, Atty. Gen., John J. Klee, Jr., Deputy Atty. Gen., George Stoll, Asst. U.S. Atty., San Francisco, Cal., Richard Martland, Asst. Atty. Gen., Jeffrey J. Fuller, Deputy Atty. Gen., Sacramento, Cal., for defendants.

## OPINION AND ORDER

THELTON E. HENDERSON, District Judge.

In this case involving the calculation of welfare benefits under California's Aid to Families with Dependent Children [AFDC] program, the question presented is whether mandatory payroll deductions, such as income tax withholdings, constitute "work expenses" subject to the $75.00 limit of the standardized work expenses exclusion from gross income, or whether they constitute non-income items properly excluded from gross income in their entirety.

### I.

### PROCEDURAL POSTURE OF THE CASE

The Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1343(4), and 42 U.S.C. § 1983.

Plaintiffs are the class of all past, present and future California AFDC recipients who have been or will be affected by a substantive change recently implemented in the AFDC program as a result of the enactment of the Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 2302, 95 Stat. 357, 844–45 (1981) (codified at 42 U.S.C. § 602(a) (1976 and Supp.1982)) [hereinafter cited as "OBRA"]. The class representatives are Sandra Turner, Debra Scruggs, Jerrylean Baker, and the California Coalition of Welfare Rights Organizations. The individual representatives have been adversely affected by the recent substantive change in California's AFDC program. The Coalition is a statewide association whose membership includes AFDC recipients.

Defendants are Marion J. Woods, Kyle McKinsey, Mary Ann Graves, and the Departments of Social Services and of Finance of the State of California. Woods and McKinsey are Director and Deputy Director of the Department of Social Services. Graves is Director of the Department of Finance.

The third-party defendant is Richard J. Schweiker, Secretary of the United States Department of Health and Human Services [DHHS].

The substantive change in the AFDC program whose legality plaintiffs challenge is implemented by California Department of Social Services regulations EAS 44–113.211, 44–113.212 and 44–113.213, as amended November 10, 1981, in the wake of OBRA. These regulations change the methods by which AFDC benefits are calculated: the state defendants, guided by the third-party defendant's instructions, now consider mandatory payroll deductions as "work expenses" incurred by working AFDC recipients in obtaining "income," rather than as non-income items.

Plaintiffs move for a permanent injunction restraining defendants from including mandatory payroll deductions within the definition of "income" for purposes of determining AFDC eligibility and calculating

AFDC grants.[1] Defendants in turn move for summary judgment against the third-party defendant, binding the third-party defendant to any judgment issued against defendants on plaintiffs' motion.

After considering the memoranda of all parties, and the oral argument of counsel, including the memoranda and argument of the third-party defendant, for the reasons hereinafter stated, the Court grants both motions.

## II.

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants argue persuasively that, as a practical matter, they are bound to follow the third-party defendant's instructions regarding calculation of AFDC benefits. The AFDC program is one of several joint federal-state public assistance programs. Each participating state administers benefits according to a state plan which must be approved by the third-party defendant, DHHS Secretary Schweiker. If the state plan received DHHS approval, the federal government reimburses the state for a large percentage of the benefits paid and the administrative costs incurred. But if the state plan does not receive DHHS approval, the state must foot its AFDC bill alone. *See* 42 U.S.C. §§ 603–04 (1976 and Supp.1982).

With respect to the issue raised by plaintiffs' motion in the instant case, the Secretary has taken the position that mandatory payroll deductions should be considered "work expenses" for purposes of calculating AFDC benefits. *See* Declaration of John J. Klee, Jr., ¶ 2 (May 27, 1982). The Secretary has stated that a state plan which treats mandatory payroll deductions as non-income items rather than as work expenses would be violating DHHS regulations, *id.,* and presumably such a state plan would not receive DHHS approval absent a court order. For this reason, the Secretary has not opposed defendants' motion for summary judgment against DHHS in the event that

plaintiffs' motion for a permanent injunction is granted.

Since this Court is granting plaintiffs' motion, *infra* pp. 607–615, defendants' motion for summary judgment is also granted.

## III.

### PLAINTIFFS' MOTION FOR A PERMANENT INJUNCTION

#### A. BACKGROUND

■ Congress enacted the AFDC program under Title IV, Part A, of the Social Security Act of 1935, Pub.L. No. 271, 49 Stat. 627–29 (1935) (current version at 42 U.S.C. §§ 601–676 (1976 and Supp.1982)). The AFDC program serves two Congressional purposes: to provide for the needs of families with dependent children, 42 U.S.C. § 601 (1976), and to encourage AFDC families to secure and retain employment, *Shea v. Vialpando,* 416 U.S. 251, 264, 94 S.Ct. 1746, 1755, 40 L.Ed.2d 120 (1974). Explication of the complex statutory scheme by which these twin goals are implemented is significantly aided by an historical approach.

Pursuant to the 1935 enactment of the Social Security Act, participating states established statewide "standards of assistance." The "standard of assistance" is the minimum dollar amount that, in the state's judgment, an AFDC family of a given size requires to provide for its essential needs. *Shea v. Vialpando,* 416 U.S. at 253, 94 S.Ct. at 1750. The "standards of assistance" established a mechanism for states accurately to provide for the needs of non-working families with dependent children, but the Social Security Act did not in its original form require that states decrease the size of grants paid to needy families with other income sources. Hence the Act created at least the theoretical possibility that working recipients might be *overpaid.* *See Hearings Relative to the Social Security Amendments Act of 1939,* 76th Cong., 1st

---

**1.** As is hopefully made clear *infra,* p. 609, items excluded from "income" under the AFDC statutes are also, as a logical matter, excluded from "work expenses."

Sess. at 2254 (1939) (colloquy between Representative Duncan and Arthur Altmeyer).

In 1939, Congress responded to this over-payment problem by requiring that grants must be referenced to recipients' other income sources:

> the state agency shall, in determining need, take into consideration any . . . income and resources [other than AFDC payments] of any child claiming [AFDC].

Social Security Amendments Act of 1939, Pub.L. No. 76–379, § 401(b), 53 Stat. 1360, 1379–80 (1939) (codified at 42 U.S.C. § 602(a)(7)(A) (1976 and Supp.1982)). In other words, each AFDC recipient's grant was to be decreased by an amount exactly corresponding to the recipient's non-AFDC income. This income-referencing requirement served the first of the twin AFDC goals mentioned above, by ensuring that working recipients were not paid more AFDC benefits than they actually needed. However, in practice the income-referencing requirement disserved the second purpose of encouraging work, because working AFDC recipients received nothing extra to cover the costs—such as, for example, transportation and special clothing—incurred in obtaining non-AFDC income. Since non-working AFDC recipients did not incur these costs, the 1939 Amendments Act left working AFDC recipients *worse off* than non-working AFDC recipients. *See* Social Security Board State Letter No. 4, "Facilitating Employment of Assistance Recipients Through Means of Sound Determination of Need" (April 30, 1942), published in *Handbook of Public Assistance Administration* at § 3140 (1962); *Hearings on Public Assistance Act of 1962 before the Senate Committee on Finance,* 87th Cong., 2d Sess. 152 (1962) (testimony of HEW Secretary Ribicoff); S.Rep. No. 1589, 87th Cong., 2d Sess. 17–18, *reprinted in* 1962 U.S.Code Cong. & Ad.News 1943, 1959–60.

In 1962, Congress solved this underpayment problem by mandating that "any expenses reasonably attributable to the earning of . . . income" were to be disregarded from gross income in calculating the amount of the recipient's "income" to be used in decreasing AFDC benefits. In other words, "work expenses" operated as a credit for AFDC recipients.[2] Public Welfare Amendments Act of 1962, Pub.L. No. 87–543, § 106(b), 76 Stat. 172, 188 (1962), *amended by* OBRA, *supra,* p. 606, § 2302, 95 Stat. at 844–45 (codified at 42 U.S.C. § 602(a)(8)(A)(ii)–(iii) (1976 and Supp. 1982)). The Supreme Court interpreted this "work expenses" disregard to require participating states to provide for *itemization* of work expenses by each AFDC family. *Shea v. Vialpando,* 416 U.S. at 260, 94 S.Ct. at 1753. Itemization of work expenses ensured that AFDC families were no longer discouraged from working, but in practice led to two new problems: administrative burden and applicant falsification. S.Rep. No. 97–139, 97th Cong., 1st Sess. 501–02, reprinted in 1981 U.S.Code Cong. & Ad. News 396,768.

In 1981, Congress met these new problems by *standardizing* the "work expenses" disregard: instead of itemizing their individual work expenses, working AFDC recipients now receive a standardized $75.00 per month as a credit against their gross income, regardless of the amount of their actual work expenses. OBRA, *supra,* p. 606, § 2301, 95 Stat. at 844–45 (codified at 42 U.S.C. § 602(a)(A)(ii)–(iii) (1976 and Supp.1982)).[3] Thus in its present form the Social Security Act requires participating states to calculate benefits for working AFDC recipients according to a four-step formula: *first,* the state determines the

**2.** Congress subsequently mandated the "work incentive" disregard to help solve the same underpayment problem, Social Security Amendments of 1967, Pub.L. No. 90–248, § 202(b), 81 Stat. 821, 881 (1968), *amended by* OBRA, *supra,* p. 606, § 2301, 95 Stat. at 844 (codified at 42 U.S.C. § 602(a)(8)(B)(ii) (1976 & Supp.1982), but the "work incentive" disregard is not relevant to resolution of the issue presently before the Court.

**3.** The 1981 Congress also modified the "work incentive" disregard, so that it applies only during the first four months that an AFDC family has work income. OBRA, *supra,* p. 606, 95 Stat. at 844–45 (codified at 42 U.S.C. § 602(a)(8)(B)(ii) (1976 and Supp.1982)).

family's "income"; *second,* the state subtracts from income the standardized "work expenses" disregard; *third,* the state subtracts from income the "work incentive" disregard; and *fourth,* after determining the applicable "standard of assistance," the state uses the adjusted "income" amount obtained by the first three steps to decrease the working recipient's grant. *RAM v. Blum,* 533 F.Supp. 933 at 942 (S.D.N.Y. 1982); *Dickenson v. Petit,* 536 F.Supp. 1100 at 1105–06 (D.Me.1982); *James v. O'Bannon,* 557 F.Supp. 631 at 635 (E.D.Penn.1982). The precise meanings of two of the terms of art used in this formula—"income" and "work expenses"—lie at the core of the mandatory payroll deductions issue presently before the Court.

## B. THE ISSUE

Plaintiffs contend that "income" in the AFDC statutes means *net* income, and thus that mandatory payroll deductions are non-income items. Since as a logical matter non-income items cannot be "work expenses" disregarded from income,[4] in plaintiffs' view "work expenses" are limited to out-of-pocket expenses such as transportation and special clothing. Consequently, plaintiffs argue that the Social Security Act requires participating states to subtract from a working AFDC recipient's gross income *both* mandatory payroll deductions *and* the newly-standardized $75.00 per month "work expenses" disregard, before using this adjusted "income" amount to decrease AFDC benefits.

By contrast, the Secretary has instructed defendants that "income" in the AFDC statutes means *gross* income, and thus that mandatory payroll deductions are income items—properly characterized as "work expenses." In the Secretary's view, "work expenses" include both out-of-pocket expenses and mandatory payroll deductions.

Consequently, apart from the "work incentive" disregard (which is not at issue), defendants subtract from a working AFDC recipient's gross income only the newly-standardized $75.00 per month "work expenses" disregard, before using this adjusted "income" amount to decrease AFDC benefits.

## C. STANDARD OF REVIEW

■ The issue in this case, then, is one of statutory interpretation: what do the words "income" and "work expenses" in the AFDC statutes mean? The starting place in any problem of statutory construction is the literal language of the statutes. *Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Unfortunately, no provision of the Social Security Act of 1935, or of the amending Acts of 1939, 1962 or 1967, or of OBRA has ever defined "income" or "work expenses"; nor does anything in the context of the AFDC statutes in which these terms appear guide us in determining their meaning.[5]

In the absence of any intrinsic statutory directive, we must rely upon extrinsic aids to statutory construction in determining whether or not Congress intended mandatory payroll deductions to be disregarded from gross income in addition to the standardized $75.00 per month "work expenses" disregard. Two types of extrinsic aids have materially assisted us in determining that Congress intended disregard of mandatory payroll deductions over and above the work expenses disregard: the legislative and administrative history, and the congressional purpose underlying the AFDC statutes. In analyzing these materials, the Court acknowledges its large debt not only to the excellent papers provided by the parties to this action, but also to the exhaustive research manifest in the carefully-reasoned opinions of the three district courts which

**4.** An item must be "income" before it can be disregarded from income. *See RAM v. Blum, supra,* p. 609, at 946.

**5.** As the Supreme Court has observed, the AFDC program is an area in which Congress

"has voiced its wishes in muted strains and left it to the courts to discern the theme in the cacophony of political understanding," *Rosado v. Wyman,* 397 U.S. 397, 412, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970).

have previously considered the issue before us now. *See RAM v. Blum, supra,* p. 609 (concluding that mandatory payroll deductions are non-income items and therefore must be disregarded over and above the "work expenses" disregard); *Dickenson v. Petit, supra,* p. 609, and *James v. O'Bannon, supra,* p. 609 (both concluding that mandatory payroll deductions are work expense items which therefore should *not* be disregarded in addition to the "work expenses" disregard). Much of what follows is culled from these cases.

## D. LEGISLATIVE AND ADMINISTRATIVE HISTORY

 Persuasive evidence of Congress' intent in drafting statutory language is frequently found in legislative history, *see Nat'l R. Passenger Corp. v. Nat'l Ass'n of R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974), and understanding of legislative history is in turn aided by the history of administrative interpretations of the statutory language, *see Saxbe v. Bustos,* 419 U.S. 65, 74, 95 S.Ct. 272, 278, 42 L.Ed.2d 231 (1974). Moreover, administrative interpretations of statutory language by the agency charged with the statute's administration are entitled to considerable deference in their own right, *United States v. Rutherford,* 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979), particularly if the interpretation in question is a long-standing one, *EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1980).

 In the instant case, the legislative and administrative materials pertaining to the term "income" persuade us that Congress did not intend "income" to include mandatory payroll deductions. This conclusion precludes the necessity of inquiry into whether the different set of legislative and administrative materials pertaining to the term "work expenses" indicates that Congress intended "work expenses" to include mandatory payroll deductions since, as a logical matter, mandatory payroll deductions cannot be *both* "non-income items"

and "work expenses disregarded from income": an item must be "income" before it can be disregarded from income. *See RAM v. Blum, supra,* p. 609, at 946. However, because the Secretary's legislative and administrative history arguments focus almost exclusively on materials pertaining to the term "work expenses," examination of those materials follows our examination of the materials pertaining to "income."

### 1. Legislative and Administrative Materials Pertaining to "Income."

The 1939 provision requiring participating states to reference AFDC benefits to "income" was drafted by the Social Security Board, predecessor agency to DHHS. H.R.Doc. No. 110, 76th Cong., 1st Sess. (1939) (Presidential report to Congress transmitting Social Security Board's "Proposed Changes in the Social Security Act"). As noted, supra, p. 608, the legislation as enacted provided that:

the State agency shall, in determining need, take into consideration any . . . income and resources [other than AFDC payments] of any child claiming [AFDC].

Social Security Amendments Act of 1939, *supra,* p. 608, § 401(b), 53 Stat. at 1379–80 (1939) (codified at 42 U.S.C. § 602(a)(7)(A) (1976 and Supp.1982)). Despite many amendments to other clauses of Section 602(a)(7)(A), the language just quoted pertaining to "income" has never been changed. *RAM v. Blum, supra,* p. 609, at 944. Hence the legislative history most relevant to analysis of the meaning of "income" is that surrounding the 1939 Amendments. *See Blair v. Chicago,* 201 U.S. 400, 453–54, 26 S.Ct. 427, 437–38, 50 L.Ed. 801 (1905).

The House and Senate reports relating to the 1939 Amendments are unilluminating, *RAM v. Blum, supra,* p. 609, at 945, but other parts of the legislative record indicate that Congressional intent was focused on requiring states to subtract from recipients' grants only the amount of "income" actually available to them. *Hearings Relative to the Social Security Amendments Act of 1939,* 76th Cong., 1st Sess. at 2254 (colloquy

between Representative Duncan and Arthur Altmeyer, then Chairman of the Social Security Board); 84 Cong.Rec. 6851 (June 8, 1939) (remarks of Representative Poage). Moreover, contemporaneously with enactment of the income-referencing requirement, the Social Security Board—draftors of the requirement—issued an administrative interpretation defining "income" as funds that "actually exist" and are "available," in the sense that the funds are "actually ... on hand or ready for use when ... needed." Policy Statement of the Social Security Board (December 20, 1940), reprinted in *Guide to Public Assistance Administration,* § 202, at pp. 1–2 (1942). This interpretation of the statute by the agency charged with its administration deserves considerable deference, *United States v. Rutherford,* 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979), and buttresses the *RAM* court's conclusion that:

> [t]he legislative history ... strongly indicates that Congress, in enacting the Social Security Amendments Act of 1939, understood the word 'income' to mean *net* income, and thus not to include mandatory payroll deductions.

*RAM v. Blum, supra,* p. 609, at 947 (emphasis in original).

In addition to buttressing the theoretical conclusion that the 76th Congress intended "income" to mean *net* income, the Social Security Board's 1940 administrative interpretation had the practical effect of influencing states administering AFDC programs from 1939–62 to disregard mandatory payroll deductions before subtracting "income" from the "standard of assistance" —i.e., the states treated "income" as meaning net income. *RAM v. Blum, supra,* p. 609, at 945. This state practice of treating "income" as net income has received tacit Congressional approval, since Congress has never availed itself of the opportunity to amend the language pertaining to "income," even when other sections of the AFDC statutes were being amended in 1962. *See Saxbe v. Bustos,* 419 U.S. at 74, 95 S.Ct. at 278–79 (Congressional silence implies approval). Thus the legislative and administrative history pertaining to the term "income" strongly supports the conclusion that Congress intended the term *not* to include mandatory payroll deductions.

## 2. Legislative and Administrative Materials Pertaining to "Work Expenses."

The Secretary does not refute the 1939 legislative and administrative materials pertaining to the term "income." Rather, the Secretary contends that, regardless of what the 1939 Congress intended regarding the meaning of "income," the more recent Congressional intent has been that mandatory payroll deductions constitute "work expenses." *See Dickenson v. Petit, supra,* p. 609, at 1112–13. At best, this argument would lead to the conclusion that the different Congresses unwittingly sent contradictory signals. However, the recent legislative and administrative history of the Social Security Act does not support the conclusion that the more recent Congressional intent has been to include mandatory payroll deductions among "work expenses."

As noted, *supra,* pp. 607–608, the "work expenses" disregard was introduced by Section 106(b) of the Public Welfare Amendments Act of 1962, *supra,* p. 608, 76 Stat. at 188 (1962), amended by OBRA, *supra,* p. 606, § 2302, 95 Stat. at 844–45 (1981) (codified at 42 U.S.C. § 602(a)(8)(A)(ii)–(iii) (1976 and Supp.1982)). Nothing in the legislative record of that Act even remotely suggests any Congressional intent to subtract mandatory payroll deductions from "income" pursuant to the newly-created "work expenses" disregard. This absence is not surprising for, as the *RAM* court noted:

> since mandatory payroll deductions were not within the meaning of [Section 602(a)(7)(A) ] income, there was no reason for Congress to pass legislation requiring such amounts to be [disregarded as "work expenses"] from ... income.

*RAM v. Blum, supra,* p. 609, at 946.

Despite both the barren 1962 legislative record and the long-standing administrative practice of treating mandatory payroll deductions as non-income items, the Secretary urges that mandatory payroll deductions

became "work expenses" sometime around or after 1962. His arguments derive from three sources: administrative practice in the states from 1962–81, the 1981 legislative history of OBRA, and present DHHS regulations.

First, the Secretary relies upon an administrative practice which grew up in many states in the years following the 1962 introduction of the "work expenses" disregard, and particularly in the years following the 1974 *Shea* decision requiring that "work expenses" be itemized. On the forms used in computing recipient grants, many states listed mandatory payroll deductions in the "work expenses" category. *See* Internal Memorandum of the Department of Health, Education and Welfare (February 1, 1972) (discussing expenses reasonably attributable to the earning of income); *see also James v. O'Bannon, supra,* p. 631, at 639. The Secretary offers this practice as evidence that mandatory payroll deductions became "work expenses" in the post-1962 period. However, a likelier explanation for the practice is simple administra-

tive convenience. For those states itemizing work expenses, either before or after *Shea,* there was no practical reason to distinguish between those items disregarded from income because they were work expenses—either way the mandatory payroll deductions were not going to be counted as "income" for purposes of decreasing benefits. And the Secretary's own exhibits reveal that, in those states in which work expenses were not itemized prior to 1974, mandatory payroll deductions—although listed in the "work expenses" category on the forms—were nonetheless computed on an *individualized basis* flatly inconsistent with the treatment then accorded to work expenses in those states. *See* Internal Memorandum of the Department of Health, Education and Welfare (March 22, 1978) (discussing treatment of work expenses); Internal Memorandum of the Department of Health, Education and Welfare (April 3, 1972) (discussing expenses reasonably attributable to the earning of income); *see also Shea v. Vialpando,* 416 U.S. at 255, 94 S.Ct. at 1751.[6] Hence we conclude that

---

**6.** As noted, *supra,* p. 608, the Supreme Court in *Shea* held that the 1962 amendments to the Social Security Act required itemization of work expenses. The specific state plan disapproved in *Shea* had required "individualized treatment of mandatory payroll deductions and child-care costs," but permitted standardized treatment of "all other work-related expenses." *Shea,* 416 U.S. at 255, 94 S.Ct. at 1751. Thus in our view the state plan disapproved in *Shea* provides further evidence that, in the years after 1962, states administering AFDC programs still considered mandatory payroll deductions as items excluded from "income" and therefore excluded from the "work expenses" category.

We note that a different conclusion was reached by the court in *Dickenson v. Petit, supra,* p. 609. The *Dickenson* court concluded that "in *Shea,* the Supreme Court ... implicitly recognized mandatory payroll deductions ... as work-related expenses under pre-OBRA law." *Dickenson v. Petit, supra,* p. 609, at 1113–14. The *Dickenson* court did not indicate the location in *Shea* of this "implicit recognition," but the language quoted above from page 255 of the *Shea* opinion is the only language in *Shea* we can find which might arguably support the *Dickenson* court's conclusion. The *Dickenson* court may have reasoned that, since the Supreme Court's discussion in *Shea* of "mandatory payroll deductions and

child-care costs" is immediately followed by the reference to "all *other* work-related expenses," *Shea,* 416 U.S. at 255, 94 S.Ct. at 1751 (emphasis supplied), mandatory payroll deductions and child-care costs must both be work-related expenses.

We note that, as a grammatical matter, the word "other" is ambiguous, in that it can also be taken as referring solely to "child-care costs" and not to "mandatory payroll deductions": i.e., we read the *Shea* court's reference to "other work-related expenses" to imply that child-care costs are work expenses but that mandatory payroll deductions are still non-income and non-work-expense items. This reading recommends itself to us because:

(1) mandatory payroll deductions were certainly not work expenses before 1962, when there was no "work expenses" disregard;

(2) as noted, *supra,* pp. 611–612, nothing in the 1962 legislative history indicates that mandatory payroll deductions became work expenses in 1962;

(3) as noted, *supra,* p. 612, nothing in the administrative practice in the years immediately following the 1962 introduction of the "work expenses" disregard indicates that mandatory payroll deductions became work expenses during those years;

(4) We do not believe that the Supreme Court in *Shea* would have announced a change in the status of mandatory payroll

administrative practice in the years 1962–81 does not support the Secretary's contention that mandatory payroll deductions constitute "work expenses."

Second, the Secretary relies upon the legislative history of OBRA to support his contention that mandatory payroll deductions constitute "work expenses." In particular, he calls our attention to S.Rep. No. 97–139, *supra,* p. 608, at 770–71, which indicates that the 97th Congress may have understood "income" in the AFDC statutes to mean *gross* income. *See Dickenson v. Petit, supra,* p. 609, at 1114–15. However, as noted, *supra,* pp. 610–611, OBRA amended the statutory language pertaining to the "work expenses" disregard but did *not* amend the language pertaining to the "income"-referencing requirement; hence the legislative history of OBRA is relevant to an understanding of the term "work expenses," but not to the meaning of the term "income." *See Blair v. Chicago,* 201 U.S. at 453–54, 26 S.Ct. at 437–38. The Secretary fails to point us to any passage in the legislative record of OBRA at which mandatory payroll deductions are referred to as "work expenses." Moreover, the very Senate report upon which the Secretary relies expressly characterizes "work expenses" as administratively burdensome items subject to applicant falsification, S.Rep. No. 97–139, *supra,* p. 608, at 768–69. Yet mandatory payroll deductions are paradigmatic examples of items *not* subject to applicant falsification and not at all difficult for administering states to calculate. *RAM v. Blum, supra,* p. 609, at 946. Hence we conclude that, if anything, the legislative history of OBRA indicates that Congress did *not* intend mandatory payroll deductions to be considered "work expenses."

Finally, the Secretary points to the present DHHS regulations implementing the "work expenses" disregard provision of the AFDC statutes, 42 U.S.C. § 602(a)(8)(A)(ii) (1976 and Supp.1982). The statutory provision calls for this stan-

dardized disregard of $75.00 to come from "earned income," which the DHHS regulations define as:

> the total amount, irrespective of personal expenses, *such as income-tax deductions,* lunches, and transportation to and from work, and irrespective of expenses of employment which are not personal, such as the cost of tools, materials, special uniforms, or transportation to call on customers.

45 C.F.R. § 233.20(a)(6)(iv), *as amended in* 47 Fed.Reg. 5648, 5676 (1982) (emphasis supplied). The Secretary argues persuasively that this regulation places mandatory payroll deductions in the same category as out-of-pocket "work expenses" such as transportation, lunches and special clothing. *See Dickenson v. Petit, supra,* p. 609, at 1111; *James v. O'Bannon, supra,* p. 631, at 638. However, the regulation is flatly inconsistent with another DHHS regulation, entitled "Income and Resources," which requires that:

> [a] State plan for ... AFDC ... must ... provide that, in determining need and the amount of the assistance payment, ... *net income ... available for current use* ... shall be considered.

45 C.F.R. § 233.20(a)(3)(ii)(D), as amended in 47 Fed.Reg. 5648, 5675 (1982) (emphasis supplied). The regulation cited by the Secretary defines mandatory payroll deductions as "work expenses," yet the latter regulation defines mandatory payroll deductions as non-income items. As noted, *supra,* p. 610, logic precludes mandatory payroll deductions from being both non-income items and work expenses disregarded from income, since an item must be income before it can be disregarded from income. *See RAM v. Blum, supra,* p. 609, at 946. Hence we decline to draw any conclusions about Congressional intent from the clearly inconsistent regulations promulgated by DHHS, and, in light of this inconsistency, we believe it would be inappropriate to

deductions by means of a single ambiguous reference to "other work-related expenses." For these reasons we disagree with the *Dickenson* court's conclusion that *Shea* implicitly

recognized mandatory payroll deductions as work expenses.

defer to the Secretary's present interpretation of the AFDC statutes.

In sum, our review of the legislative and administrative history of the Social Security Act of 1935, the amending Acts of 1939 and 1962, and OBRA leads us to agree with the *RAM* court that Congress intended mandatory payroll deductions to be disregarded in calculating the amount of an eligible family's AFDC grant because such deductions are not "income," and *not* because such deductions are "work expenses."

### E. CONGRESSIONAL PURPOSE

▇ In this case, the parties and the three district courts which have considered the issue have de-emphasized arguments derived from congressional purpose, as compared with the exhaustive treatment accorded arguments derived from legislative and administrative history. However, any court faced with a problem of statutory construction must endeavor to interpret the statute at issue in light of the purposes Congress sought to serve. *Chapman v. United States,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979). We conclude that the Congressional purposes underlying the AFDC statutes provide a persuasive and independent basis supporting our conclusion that the Social Security Act requires subtraction from gross income of mandatory payroll deductions in addition to subtraction of the "work expenses" disregard.

As noted, *supra,* p. 607, the AFDC program serves two Congressional purposes: to provide for the needs of families with dependent children, 42 U.S.C. § 601 (1976), and to encourage AFDC families to secure and retain employment, *Shea v. Vialpando,* 416 U.S. at 264, 94 S.Ct. at 1755. This case presents two alternatives: either mandatory payroll deductions constitute "work expenses," or they constitute non-income items which must be disregarded from gross income *in addition to* the "work expenses" disregard. In the context of Congressional purpose, the question thus becomes: which of these alternatives best serves the twin Congressional purposes underlying the AFDC statutes?

Defendants' own statistics reveal that the average amount of mandatory payroll deductions for working AFDC families in California in 1980 was $83.00 per month. California State Department of Social Services Program Series Information Report 1982–01, "AFDC Social and Economic Characteristics for Families Receiving Aid during July 1980" at Table 18 (January 1982). The average amount of out-of-pocket work-related expenses for working AFDC families in California in 1980 (not including mandatory payroll deductions or child care costs)[7] was $80.00 per month. *Id.* Treating the effects of inflation, which make both 1980 figures somewhat low for 1982, as counterbalanced by the effects of applicant falsification, which make the out-of-pocket expenses figure somewhat high, these figures can be taken as roughly accurate estimates of the actual expenses of working AFDC families in California in 1982.

According to these figures, the average working AFDC family in California incurs $163.00 of expenses in obtaining income ($83.00 in mandatory payroll deductions plus $80.00 in out-of-pocket expenses). If mandatory payroll deductions were included as "income" and constituted "work expenses," then the average working AFDC family in California would receive as a credit only $75.00 per month (the standardized "work expenses" disregard) to cover these $163.00 of expenses.

Under these circumstances, the average working AFDC family in California would have a very strong incentive not to work, since each family would be on average $88.00 per month *worse off* than if it had declined to work.[8] Such a result would

---

7. Child care costs are "work expenses" that are still itemized, post-OBRA, 42 U.S.C. § 602(a)(8)(A)(iii), and hence do not fall under the $75.00 category covering the other out-of-pocket "work expenses."

8. As noted, *supra,* p. 608 n. 3, the newly-amended "work incentive" disregard applies only for the first four months that an AFDC family has work income and hence cannot be

clearly be inconsistent with the Congressional purpose of encouraging work, as well as fundamentally wrongheaded.

If on the other hand mandatory payroll deductions constitute non-income items and are thus subtracted from gross income in addition to the "work expenses" disregard, then the average working AFDC family in California will receive $158.00 ($83.00 in mandatory payroll deductions plus the standardized $75.00 "work expenses" disregard) to cover the $163.00 of expenses incurred in obtaining income. Under these circumstances, the average working AFDC family in California will have only a very slight incentive not to work, since each family will be on average $5.00 per month worse off than if it had declined to work.[9] This slight disincentive may be less than ideal, but it is much more consistent with the Congressional purpose of encouraging work than the alternative of creating a very strong disincentive to work.

■ Hence we conclude that the Congressional purposes underlying the AFDC statutes indicate that the Social Security Act requires subtraction from gross income of mandatory payroll deductions *in addition to* subtraction of the $75.00 per month "work expenses" disregard. This conclusion is buttressed by a long line of cases holding that the Congressional purpose of encouraging work can only be served by limiting the amount of "income" counted against a recipient to funds that are actually and currently available. *See King v.*

*Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968) (striking down a state regulation which denied benefits to the dependent children of a woman cohabiting with a man, regardless of whether the man in fact contributed to the support of the children); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970) (striking down similar state statute); *Van Lare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1974) (striking down state statute which denied benefits to dependent children of woman permitting lodger to stay with family, regardless of whether lodger actually contributed to the support of the children); *see also Watson v. Comm. Dept. of Public Welfare,* 42 Pa.Cmwlth. 181, 400 A.2d 669 (1979) and *Harbolic v. Berger,* 43 N.Y.2d 102, 400 N.Y.S.2d 780, 371 N.E.2d 499 (1977) (both cases holding that, under state welfare statutes, mandatory payroll deductions are not income currently and actually available for use by welfare recipients).[10] As the *Harbolic* court noted:

> When taxes are taken from a home relief recipient's wages at the source they might just as well have never been earned by him at all insofar as his ability to meet his immediate need to feed, house or clothe his family is concerned. Blindness to that fact can serve but to sap a recipient's incentive to work and so tends to operate at cross-purposes to the legislative intent.

*Harbolic,* 400 N.Y.S.2d 783–84, 371 N.E.2d at 502–03.[11]

---

counted upon to overcome the disincentive to work that would be created by interpreting "work expenses" to include mandatory payroll deductions.

9. A likely explanation for this slight disincentive in California was offered at oral argument by counsel for the Secretary: the $75.00 "work expenses" disregard was designed to apply in all states, but minor inequities inevitably result in that the cost of living is higher in certain states (such as California) than in others.

10. The Secretary attempts to distinguish these cases by arguing that their emphasis on the actual availability of income refers not to the level of income from a particular source, but to the availability of the source itself. *See Dickenson v. Petit, supra,* p. 609, at 1115–17 n. 13.

We find this distinction unsupported by the language of these cases, each of which uniformly speaks in terms of the availability *of income,* and not of the availability *of sources* of income. However, we also note that we do not rely upon these cases for our conclusion that defendants' own statistics demonstrate that the Secretary's interpretation of mandatory payroll deductions as "work expenses" would radically disserve the Congressional purposes underlying the AFDC statutes.

11. The absurdity inherent in treating as "income" funds never actually received is dramatically underscored by a recent California case holding that, should recipients subsequently receive any of the withheld mandatory payroll deductions (as, e.g., income tax refunds), they

## IV. ORDER

For the foregoing reasons, good cause appearing,

IT IS HEREBY ORDERED that defendants Marion J. Woods, Kyle McKinsey, Mary Ann Graves, the Department of Social Services of the State of California and the Department of Finance of the State of California, their successors in office, their agents, officers and employees and representatives, including employees of county welfare departments, are permanently enjoined from including mandatory payroll deductions such as federal, state and local income taxes, Social Security taxes (F.I.C.A.) and state disability insurance within the definition of "income" in interpreting and applying that term as used in Section 602(a)(7)(A) of Title 42 of the United States Code.

IT IS FURTHER ORDERED that third-party defendant Richard J. Schweiker, Secretary of the United States Department of Health and Human Services, is permanently enjoined from responding to defendants' compliance with this Order by terminating federal matching funds contributed to California's AFDC Program.

## MOTIONS FOR RECONSIDERATION, STAY PENDING APPEAL AND CIVIL CONTEMPT

This cause came on for hearing on August 30, 1982, on three motions: defendants' motion for reconsideration of the Court's July 29, 1982 Opinion and Order, defendants' motion in the alternative for a stay of the July 29 Order pending appeal, and plaintiffs' motion for civil contempt for defendants' alleged noncompliance with the July 29 Order. The Court having heard oral argument, and having considered the papers submitted by the parties—including the August 31, 1982 letter of George C. Stoll to the Court regarding work expenses in states other than California—for the reasons hereinafter stated, all three motions are denied.

## DEFENDANTS' MOTION FOR RECONSIDERATION

On July 29, 1982, the Court held that the term "income" in 42 U.S.C. § 602(a)(7)(A) means *net* income, and therefore that mandatory payroll deductions should not be considered income items for purposes of calculating AFDC grants. Accordingly, the Court permanently enjoined defendants from including mandatory payroll deductions in an AFDC recipient's "income" for purposes of subtracting income from need to determine the amount of the recipient's grant. The Court expressly based its July 29 Opinion and Order on two separate and independent bases:

1) the legislative and administrative history of the AFDC statutes (explicated at pp. 9–18 of the Opinion), which indicate that the term "income" has always been used in the AFDC statutes to mean net income, whereas the term *"earned* income" has been used to denote gross income; and

2) the Congressional purposes underlying the AFDC statutes (explicated at pp. 18–21 of the Opinion), which indicate that the term "income" should be interpreted so as best both to provide for the actual needs of AFDC families and to encourage AFDC families to work.

Defendants challenge both bases of the Court's Opinion and Order. The Court is not persuaded that either challenge has merit.

■ Defendants' challenge to the legislative and administrative history basis consists entirely of arguments already ad-

---

will be charged with "income" again at the time the refunds are received. *Vaessen v. Woods,* 131 Cal.App.3d 1025, 182 Cal.Rptr. 725, 82 Daily Journal D.A.R. 1366 (Calif.Ct. of Appeal June 7, 1982). Conjoining the Secretary's present interpretation that mandatory payroll deductions are "income" even when withheld, with the *Vaessen* ruling that the

same funds are again "income" if refunded, would result in an injustice bordering on the Kafkaesque. Since we believe the *Vaessen* ruling comports with the Congressional intent and purpose underlying the AFDC statutes, we disapprove the Secretary's interpretation of those statutes.

vanced in their papers and at oral argument prior to the July 29 Opinion and Order. The major thrust of this challenge is that the meaning of the term "earned income"—which appears in 42 U.S.C. § 602(a)(8) and which clearly means 'gross income'—should control the meaning of the term "income," which appears in 42 U.S.C. § 602(a)(7). The Court rejected this argument *sub silentio* the first time around because of the obvious flaws in the argument:

1) "earned income" is not the same term as "income";

2) when "earned income" was first enacted into the AFDC statutes in 1962, Congress did *not* conform the already-existing term "income," even though the term "income" was located in the very next subsection—thus suggesting that Congress understood the term "income" to have a different meaning from "earned income."

Moreover, the defendants' argument for reconsideration does not touch upon the central thrust of the Court's Opinion: the term "income" meant net income when it was enacted, it has never been amended, and nothing in the forty-odd years of subsequent legislative history surrounding amendments to other words and sections of the AFDC statutes has ever indicated that Congress intended to change the meaning of "income." Generalized quotations from the 1981 legislative record to the effect that Congress was hoping to cut welfare spending do not amount to indications that the meaning of "income" in 42 U.S.C. § 602(a)(7) has been changed by the passage of the Omnibus Budget Reconciliation Act.

Defendants' challenge to the congressional purpose basis underlying the July 29 Opinion and Order is also unpersuasive, but it warrants a longer look because it raises statistical matters requiring clarification. In the July 29 Opinion, the Court stated that the average mandatory payroll deductions of working AFDC recipients in California in 1982 must be *roughly* $83.00 per month, and that the average work expenses (excluding child care) must be *roughly*

$80.00 per month. We based these estimates upon certain Tables compiled by defendants, as well as upon certain developments post-dating compilation of the Tables. We advanced the numbers to demonstrate that the Congressional purposes underlying the AFDC statutes would be better served by interpreting "income" to mean net income rather than gross income: specifically, using the above statistical estimates, the Court noted that construing "income" to mean net income results in an effective credit for AFDC recipients of $158.00 ($83.00 in excluded mandatory payroll deductions plus $75.00 in standardized work expense disregards) to cover $163.00 of expenses, whereas construing "income" to mean gross income would result in an effective credit of only $75.00 (in standardized work expense disregards) to cover $163.00 of expenses. Dramatically, defendants assert that the statistics advanced by the Court are wrong, and therefore that the congressional purpose basis underlying the July 29 Order should be reconsidered.

■ Ordinarily, nothing is better calculated to galvanize a court to reconsideration than a dramatic statement that the court has used inaccurate numbers. In this case, of course, since the July 29 Opinion and Order expressly rested on two separate and independent bases, the alleged inaccuracy of the numbers, even if true, would not warrant reconsideration unless defendants had also persuaded the Court that the legislative history did not support the issuance of the injunction. But a more fundamental reason for denying the motion for reconsideration is that the defendants' argument concerning the statistics is itself unpersuasive. The Court notes three fundamental flaws with defendants' argument that the cited statistics are wrong.

■ First, the Court expressly qualified the statistics cited in the July 29 Opinion as representing only *"roughly accurate estimates"* of the average mandatory payroll deductions and average work expenses of AFDC recipients in California. This qualification was necessary because the Tables from which the statistics were culled date

from 1980, and apparently no Tables of more recent vintage are available. The Court noted that the effects of spiraling inflation would likely render 1980 figures somewhat low for 1982, but that the effects of applicant falsification of work expenses would likely render the *reported* 1980 work expenses figures somewhat higher than the *actual* 1982 figures. Moreover, plaintiffs have subsequently pointed out that the effects of the decision in *Green v. Obledo,* 29 Cal.3d 126, 172 Cal.Rptr. 206, 624 P.2d 256 (1981) would likely render the 1980 work expenses figures somewhat low for 1982. Since all these post-1980 effects remain unquantified, and since the Court expressly labeled the cited statistics as "estimates," defendants' dramatic assertion that the cited statistics are "wrong" at best amounts to hyperbole.

Second, defendants offer alternative statistical estimates culled from the same Tables which are themselves "wrong." Defendants produce lower figures for the average mandatory payroll deductions and average work expenses *by lumping full-time and part-time workers together.* Since the standardized statutory work expenses disregard at issue is applicable to *full-time workers only,* defendants' inclusion of part-time workers—whose mandatory payroll deductions and work expenses are obviously lower than those of full-time workers—produces an indefensible downward distortion in the statistics which defendants assert are the "correct" ones.

Third, and most damaging to defendants' argument, even if the Court were to base its estimates upon defendants' distorted statistics, the numbers defendants would have us use still support rather than undercut the Court's congressional purpose analysis. Defendants estimate the average mandatory payroll deductions of working AFDC recipients in California in 1982 at $70.00 per month, and the average work expenses at $42.00 per month. Using these statistical estimates, construing "income" to mean net income results in an effective credit for AFDC recipients of $145.00 ($70.00 in mandatory payroll deductions plus $75.00 in standardized work expense disregards) to cover $112.00 of expenses, whereas construing "income" to mean gross income would result in an effective credit for AFDC recipients of only $75.00 to cover $112.00 of expenses. Hence even using defendants' numbers, construing "income" to mean net income creates an incentive for AFDC families to work, whereas construing "income" to mean gross income would strongly discourage those families from working. Thus defendants have failed persuasively to challenge the congressional purpose basis underlying the July 29 Order.

Accordingly, for the foregoing reasons,

■ IT IS HEREBY ORDERED that defendants' motion for reconsideration of the July 29 Opinion and Order is denied.[1]

## THE ALTERNATIVE MOTION FOR A STAY PENDING APPEAL

■ Defendants have moved the Court in the alternative for a stay of our July 29 Order pending appeal. The effect of this stay would be to interrupt the payment of welfare benefits as ordered by the Court.

1. The Court notes that between the date of oral argument on the motion for reconsideration and the date of the present order, defendants have filed Notice of Appeal. The general rule is that a notice of appeal transfers jurisdiction over any matters involved in the appeal from the district court to the appellate court. *Petrol Stops Northwest v. Continental Oil Co.,* 647 F.2d 1005, 1010 (9th Cir.1981). The rationale for this rule is to avoid the confusion and inefficient use of scarce judicial resources that might flow from putting the same issues before two courts at the same time. *In the Matter of Thorp,* 655 F.2d 997, 998 (1981); 9 Moore, Federal Practice ¶ 203.11 n. 1.

However, an exception to the general rule exists for cases where, as here, continued district court jurisdiction will not be confusing or inefficient because the district court order is "in aid of the appeal, or to correct clerical mistakes." *In the Matter of Thorp,* 655 F.2d at 998. In light of the importance of this case and in light of the uncertainty about statistical matters engendered by our July 29 Opinion and Order, we note continued jurisdiction over the mandatory payroll deductions issues, under the exception described in *Thorp,* and for purposes of this Order only.

Four factors are relevant to deciding whether a stay pending appeal should issue:

1) the likelihood that defendants will ultimately prevail on the merits of their appeal;
2) the extent to which defendant would be irreparably harmed by denial of the stay;
3) the potential harm to plaintiffs if the stay is issued;
4) the public interest.

*Florida Businessmen For Free Enterprise v. City of Hollywood,* 648 F.2d 956, 957 (5th Cir.1981); *Bauer v. McLaren,* 332 F.Supp. 723 (D.Iowa 1971); *see also Schwartz v. Covington,* 341 F.2d 537, 538 (9th Cir.1965).

With respect to the first factor listed above, for the reasons stated both in the July 29 Opinion and in the text above denying the motion for reconsideration, the Court firmly believes the reasoning underlying its July 29 Order will withstand appellate scrutiny. Nonetheless, since no appellate court has yet decided the issue, and since the district courts which have decided the issue are split, the Court acknowledges that there is at least a fair prospect that defendants may prevail on the merits of their appeal. Hence the Court finds that the first factor weighs evenly, tipping neither for nor against defendants.

█ With respect to the last three factors listed above, however, the United States Supreme Court has indicated unequivocally that in welfare cases the harm to plaintiffs and the public interest in uninterrupted welfare benefits "clearly outweighs" the harm to defendants:

> ... the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burden.

*Goldberg v. Kelly,* 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970). Accordingly, good cause appearing,

IT IS HEREBY ORDERED that defendants' motion for a stay pending appeal is denied.

### PLAINTIFFS' MOTION FOR CIVIL CONTEMPT FOR DEFENDANTS' ALLEGED NONCOMPLIANCE WITH THE COURT'S JULY 29 ORDER

The Court issued its Order on July 29, 1982 permanently enjoining defendants from including mandatory payroll deductions within the definition of "income" for purposes of calculating AFDC eligibility and grants. Defendants estimate the cost of implementing the Court's injunction at roughly $2.5 million per month. Affidavit of California Department of Finance Director Mary Ann Graves, August 19, 1982, Exhibit A. The Court takes judicial notice of the fact that $2.5 million is a lot of money and, as such, cannot be expected to materialize overnight.

Plaintiffs contend that defendants have not complied promptly with the Court's Order, yet the facts do not support plaintiffs' contention. On August 6, 1982, defendant Mary Ann Graves requested waiver from the California Legislature of the 30-day "waiting period" purportedly required by the State Budget Act for all expenditures in excess of $500,000. On August 9, 1982, defendant Marion J. Woods notified all county welfare directors of the Court's July 29 Order, and alerted the directors to be ready for an orderly effectuation of the Court's order in a time-frame dependent upon the California Legislature's decision regarding waiver of the 30-day period. On August 20, 1982, the Legislature approved defendant Graves' request. On August 23, 1982, defendant Department of Finance approved the issuance of a letter by defendant Department of Social Services instructing all county welfare directors to implement the Court's July 29 Order beginning with the September welfare grants. Declaration of California Deputy Attorney General Charlton G. Holland, August 24, 1982, Exhibits A and B. Shortly thereafter, that letter went out.

■ Plaintiffs contend that defendants' reliance upon the State Budget Act is totally unsupported by case law, and that defendants are invoking that Act merely to conceal their wilful decision to delay compliance with the Court's July 29 Order. Plaintiffs cite authority for the proposition that state officials cannot use state law as a shield to avoid compliance with federal court orders, *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Gary W. v. State of Louisiana,* 622 F.2d 804 (5th Cir.1980), *cert. den.,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 193 (1981); *LaRaza Unida v. Volpe,* 545 F.Supp. 36 (N.D.Cal.1982), but plaintiffs cite no cases holding that state officials must *immediately* comply with federal court orders irrespective of any state law or practical constraints. In the Court's view, defendants have complied with the Court's July 29 Order within a tolerably prompt time period, since a twenty-five day delay in gathering $2.5 million and preparing for its disbursement would not have been unreasonable even if defendants had not had the State Budget Act to worry about. Thus the Court declines to decide the unnecessary question of whether defendants' reliance upon the State Budget Act was justifiable or not, particularly in light of the sensitive issues of federal-state relations which such a determination would involve. *See Welsch v. Likins,* 550 F.2d 1122, 1132 (8th Cir.1977).

Accordingly, good cause appearing,

IT IS HEREBY ORDERED that plaintiffs' motion for civil contempt for defendants' noncompliance with the Court's July 29 Order is denied.

## ORDER PROHIBITING RECOUPMENT

In November, 1981, third-party defendant Department of Health and Human Services ["DHHS"] instructed defendants to interpret certain substantive provisions of the newly-enacted Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 357 (1981) [hereinafter referred to as "OBRA"] in such a manner as to require reductions or terminations of a large number of AFDC grants. As a result, defendants notified affected AFDC recipients in November and December of 1981 that their grants were being reduced or terminated, and then proceeded to reduce or terminate payments accordingly. The form and specificity of defendants' notifications varied widely from county to county.

On December 22, 1981, this Court found the form and lack of specificity of certain of these county notices constitutionally inadequate. Accordingly, the Court issued a preliminary injunction on December 22, 1981 which prohibited defendants from reducing or terminating any AFDC payments until constitutionally adequate notice is received by the adversely affected recipient. That injunction further required defendants to issue, in counties where constitutionally inadequate notices had been sent, "supplemental payments" to AFDC recipients to restore their aid received to pre-OBRA levels.[1] Defendants were required to issue these "supplemental payments" for December and for all months thereafter until the affected AFDC recipient received constitutionally adequate notice of the payment changes resulting from DHHS' interpretation of OBRA.

This cause came on for hearing on June 21, 1982, and is referred to in the Court's Order Re: Recoupment dated July 16, 1982. The issue presented is whether defendants can and should be barred from recouping as "overpayments" aid amounts restored to AFDC recipients who received defective Notices of Action.

■ Since neither plaintiffs' nor defendants' nor the Court's research has unearthed any precedent on point, the issue appears to be one of first impression. In the absence of statutory or case precedent precluding a Court from barring recoup-

---

1. Quotation marks for the phrase "supplemental payments" are appropriate in light of the Court's July 29, 1982 Opinion and Order, holding that DHHS' interpretation of OBRA was substantively incorrect, and permanently enjoining defendants from implementing that DHHS interpretation.

ment,[2] the Court *can* bar recoupment under its general equitable powers. And after careful reflection, we are persuaded that we should bar defendants from recouping as "overpayments" the aid amounts restored by court order to recipients who received constitutionally inadequate Notices.

Our conclusion is in part guided by *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). While the Supreme Court in *Goldberg* did not speak to the issue of recoupment, it did hold that AFDC recipients are entitled to uninterrupted benefits at their current level until they have received proper, constitutionally adequate notice about any adverse change. *Goldberg*, 397 U.S. at 260–61, 90 S.Ct. at 1016. We believe that this holding supports plaintiff's position that recipient aid amounts are not affected by changes in law until the recipient has received a constitutionally adequate Notice which explains the change. Consequently, we conclude that aid amounts restored to recipients because they received inadequate notice about a change of law are not "overpayments"; rather, they are the proper payments due them.

In reaching this decision, the Court is also guided by the knowledge that in this case welfare recipients have already had the payments at issue terminated by the State and then restored by court order. It is extremely unlikely that AFDC recipients will have budgeted for the return of funds granted them by court order. *See Goldberg v. Kelly*, 397 U.S. at 266, 90 S.Ct. at 1019. Thus, as a practical matter, funds recouped by defendants would have to come out of future aid payments which, by definition, scarcely cover the recipient's immediate necessities. In the Court's judgment, this would work an unfair hardship on recipients. Accordingly,

IT IS HEREBY ORDERED that defendants are barred from recouping as "overpayments" aid amounts restored to AFDC recipients who received defective Notices of Action.

---

**2.** Defendants' argument that Section 2318 of OBRA precludes a bar to recoupment is without merit. Section 2318 states in pertinent part:

> ... the State agency will promptly take all necessary steps to correct any overpayment or underpayment of aid...

Defendants argue that this provision indicates Congressional intent that States recoup all overpayments.

A necessary premise of defendants' argument is that aid amounts restored by court order because of constitutionally defective Notices constitute "overpayments." However, the legislative history accompanying Section 2318 demonstrates that the "overpayments" envisioned by Congress did not include aid amounts restored by court order. Rather, Congress had in mind overpayments whose correction is within the power of recipients and welfare agencies.

By requiring the correction of both overpayments and underpayments, the committee believes that recipients and welfare agencies alike will be encouraged to take greater responsibility for assuring the accuracy of administration.

S.Rep. No. 97–139, 97th Cong., 1st Sess. 519, *reprinted in* [1981] U.S.Code Cong. & Ad.News 396, 785. Neither recipients nor welfare agencies have the power to correct "overpayments" resulting from court order. Accordingly, the court interprets Section 2318 to refer to "overpayments" resulting from administrative error or from other sources within the control of recipients and welfare agencies, and not to refer to aid amounts restored to recipients by court order because of constitutionally defective Notices.