RAM, By its chairperson, Lillian BENJA-MIN, on behalf of its members and all others similarly situated, and Cora Hagler, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Barbara BLUM, individually and as Commissioner of the New York State Department of Social Services, James Krauskopf, individually and as Commissioner of the New York City Department of Social Services, and Margaret M. Heckler, Secretary of the Department of Health and Human Services, Defendants.

No. 82 Civ. 372 (RJW).

United States District Court, S.D. New York.

May 17, 1983.

Community Action for Legal Services, Inc., The Legal Aid Society, and Bronx Legal Services, New York City, for plaintiffs; Timothy J. Casey, Arthur J. Fried, and Sean Delany, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendant Barbara Blum; Marion R. Buchbinder, Asst. Atty. Gen., New York City, of counsel.

Frederick A.O. Schwartz, Jr., Corp. Counsel of the City of New York, New York City, for defendant James A. Krauskopf, Henry M. Adler, Associate General Counsel, Human Resources Administration, New York City, of counsel.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., and Annette H. Blum, Regional Atty., Region II, Dept. of Health and Human Services, New York City, for defendant Margaret M. Heckler; Jonathan A. Lindsey, Asst. U.S. Atty., and Connie Raffa, Asst. Regional Atty., New York City, of counsel.

ROBERT J. WARD, District Judge.

This action challenges the legality of the method that the State of New York has determined to employ in calculating benefits to be paid to eligible New York families under the federal Aid to Families with Dependent Children ("AFDC") program. The State of New York has determined to treat the amounts mandatorily deducted from the paychecks of employed family members, e.g. amounts withheld for federal and state taxes and Federal Insurance Contributions Act ("FICA") obligations, as "income" to be taken into account in calculating the amount of an eligible family's monthly AFDC grant. Plaintiffs argue that this method of calculation violates certain provisions in the Social Security Act that govern state administration of the AFDC program. In an order dated February 9, 1982, this Court issued a preliminary injunction sought by plaintiffs in this action against defendants Blum and Krauskopf pursuant to Rule 65(a), Fed.R.Civ.P., and certified the action as a class action pursuant to Rule 23(c), Fed.R.Civ.P. *RAM v. Blum,* 533 F.Supp. 933 (S.D.N.Y.1982).[1] For the reasons stated hereinafter, the Court now grants plaintiffs' motion for summary judgment pursuant to Rule 56(a), Fed.R.Civ.P., and issues a permanent injunction against defendants Blum and Krauskopf.[2]

---

1. Defendants Blum and Krauskopf were originally prohibited from implementing the proposed changes by a temporary restraining order issued by the Court on January 20, 1982, pursuant to Rule 65(b), Fed.R.Civ.P. The Secretary of the Department of Health and Human Services ("HHS") was not named in plaintiffs' original complaint, but was joined on January 27, 1982 when Judge Kevin Thomas Duffy, sitting in Part I of this Court, granted a motion by defendant Blum for joinder pursuant to Rule 19, Fed.R.Civ.P. On January 29, 1982, the original temporary restraining order was extended to February 9, 1982. *See RAM v. Blum, supra,* 533 F.Supp. at 936.

2. Since this Court issued its preliminary injunction on February 9, 1982, seven other federal district courts have addressed the issues faced by this Court today. Three of those courts concur with this Court that the term "income" as used in section 402(a)(7)(A) of the Social Security Act, 42 U.S.C. § 602(a)(7)(A), does not include mandatory payroll deductions *Williamson v. Gibbs,* 562 F.Supp. 687 (W.D.Wash. 1983) (issuing preliminary injunction), *appeal docketed,* No. 83–3725 (9th Cir. Apr. 7, 1983); *Nishimoto v. Sunn,* 561 F.Supp. 692 (D.Hawaii 1983), *appeal docketed,* No. 83–1830 (9th Cir. Apr. 4, 1983); *Turner v. Woods,* 559 F.Supp. 603 (N.D.Cal.1982), *appeal docketed,* No. 82–4552 (9th Cir. Oct. 8, 1982). The four other courts have reached the opposite conclusion. *Gaston v. Schweiker,* No. C82–1337 (N.D.Ohio Mar. 1, 1983) (denying application for preliminary injunction); *Bell v. Hettleman,* 558 F.Supp. 386 (D.Md.1983), *appeal docketed sub nom. Bell v. Massinga,* No. 83–1227 (4th Cir. Mar. 15, 1983); *James v. O'Bannon,* 557 F.Supp. 631 (E.D.Pa., 1982), *appeal docketed,* No. 82–1438 (3d Cir.

## THE LEGAL DISPUTE

There are two named plaintiffs in this action. The first is RAM, an unincorporated association located in New York which is devoted to advancing the interests of public assistance recipients living in New York. RAM appears on behalf of its members, who include members of New York families presently receiving AFDC benefits, and on behalf of all other individuals similarly situated. The second named plaintiff is Cora Hagler, a mother of three children who currently receives AFDC payments from the State of New York. Hagler appears both individually and on behalf of all others similarly situated. Defendants are Barbara Blum, Commissioner of the New York State Department of Social Services; James Krauskopf, Commissioner of the New York City Department of Social Services; and Margaret M. Heckler,[3] Secretary of the United States Department of Health and Human Services ("HHS").

The AFDC program is administered pursuant to subchapter IV–A of the Social Security Act (the "Act"), 42 U.S.C. §§ 601–15. Under the program, the states provide assistance to certain needy families, and are in turn reimbursed for a designated portion of their payments by the federal government. The instant litigation has been precipitated by amendments to subchapter IV–A enacted in the Omnibus Budget Reconciliation Act of 1981 ("OBRA") §§ 2301–21, Pub.L. No. 97–35, 95 Stat. 357, 843–60 (1981). Plaintiffs challenge certain changes in the way AFDC benefits are to be calculated, proposed by the State of New York in response to the OBRA amendments.[4]

State governments receiving AFDC funds are required to administer their programs pursuant to a "state plan" that is in accord with subchapter IV–A and the regulations promulgated thereunder by HHS. 42 U.S.C. § 602. As required by the statute, the state plan adopted by the State of New York calculates AFDC benefits in a three-step process.[5] *First,* the state determines a dollar figure that represents a given family's monthly non-AFDC "income" as that term is used in section 402(a)(7)(A) of the Act, 42 U.S.C. § 602(a)(7)(A). That is the step at issue in the action before this Court. *Second,* the state reduces this dollar figure through the application of as many as four arithmetical adjustments referred to as "disregards," set forth in section 402(a)(8)(A) of the Act, 42 U.S.C. § 602(a)(8)(A).[6] *Third,* the resulting dollar

July 21, 1982); *Dickenson v. Petit,* 536 F.Supp. 1100 (D.Me.) (denying application for preliminary injunction), *aff'd on other grounds,* 692 F.2d 177 (1st Cir.1982).

**3.** Secretary Heckler has been automatically substituted as a defendant in place of former Secretary Richard S. Schweiker, pursuant to Rule 25(d)(1), Fed.R.Civ.P.

**4.** The changes in dispute were promulgated by defendant Blum in an Administrative Directive dated December 9, 1981 ("ADM 81–55"). ADM 81–55 directed local social service departments, *inter alia,* that amounts mandatorily deducted from the paychecks of employed family members are to be treated as "income" in calculating the amount of an eligible family's monthly AFDC grant. In January 1982 the New York City Department of Social Services, which is a "local social services department" within the meaning of the New York Social Services Law, *see* N.Y. Social Services Law § 61(1), commenced taking the administrative steps necessary to implement this instruction.

**5.** In its decision granting a preliminary injunction in this case, the Court characterized the benefits calculation process as involving four steps, rather than three. In fact, the two "disregards" that were described in the earlier decision as the second and third steps of the calculation process are but two of the four disregards created by section 402(a)(8)(A). *See infra* note 6. For the purposes of discussion herein, the Court has described all four of those disregards as the second step of a three-step process, as indicated by the following discussion.

**6.** Section 402(a)(8)(A) was significantly amended by OBRA. The two disregards found at subsections (8)(A)(ii) and (8)(A)(iii) were both created by the OBRA amendments, in conjunction with the discontinuation of the work expense disregard formerly contained in section 402(a)(7). Subsection (8)(A)(ii) provides for a flat $75 monthly disregard from the "earned income" of any employed member of a recipient family. Subsection (8)(A)(iii) provides for the disregarding of child care expenses associated with employment, not to exceed $160 per month. Subsection (8)(A)(iv) contains the so-

figure, representing "income" minus any "disregards," is subtracted from what the State has determined to be the "standard of need" for a family of the given family's composition. The difference represents the amount of the family's monthly AFDC grant.

The 1981 amendments contained in OBRA altered the second step of this three-step process. Prior to the passage of OBRA, a State plan was required to disregard, *inter alia,* "any expense reasonably attributable to the earning of [non-AFDC] income," before the net difference was in turn deducted from the family's standard of need. 42 U.S.C. § 602(a)(7) (1976).[7] Under OBRA, this individualized "work expense disregard" has been replaced by two new disregards, now codified at 42 U.S.C. §§ 602(a)(8)(A)(ii), (iii). *See supra* note 6. The first of these two new disregards applies to the costs of day-care for young children, and is not at issue in this lawsuit. The other is a flat $75 disregard from the income of any individual employed full time. This flat $75 disregard thus replaces the individualized deduction of work-related expenses other than child care for each recipient family. In enacting this change, Congress cited as potential benefits both the ease of administration and the prevention of misrepresentation.

The central disputed issue before the Court is the treatment to be accorded mandatory payroll deductions under the Act as amended by OBRA. All parties agree that

in the nineteen years prior to the passage of OBRA, during which time the individualized work expense disregard was in effect,[8] neither New York State nor other states included mandatory payroll deductions in the net income subtracted from the "standard of need" figure in calculating AFDC benefits. Defendants contend that, prior to the OBRA amendments, mandatory payroll deductions were disregarded as part of the itemized work expense disregard. Accordingly, defendants argue that *gross* income is to be used in calculating the income available to a family from non-AFDC sources. Plaintiffs, on the other hand, contend that the term "income" as used in section 402(a)(7)(A) has, since its adoption in 1939, referred to a family's income available for support after mandatory payroll deductions have been withheld.

## DISCUSSION

The issue before the Court is a narrow one of statutory construction: Does the term "income" as used in section 402(a)(7)(A) include mandatory payroll deductions? While the resolution of any problem of statutory construction should begin with an examination of the language of the statute itself, *Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Mohegan Tribe v. Connecticut,* 638 F.2d 612, 618 (2d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981), the

---

called "work incentive disregard," which provides for the disregarding of the first $30 of an employed family member's monthly "earned income," plus one-third of the remainder thereof. The OBRA amendments basically limited the work incentive disregard to the first four months of employment. *See* section 402(a)(8) (B)(ii)(II), 42 U.S.C. § 602(a)(8)(B)(ii)(II). Subsection (8)(A)(i), which was not amended by OBRA, requires that the "earned income" of family members who are students be disregarded.

**7.** In full, section 402(a)(7) in its pre-OBRA form provided:

 A State plan for aid and services to needy families with children must ...

 (7) except as may be otherwise provided in [section 402(a)(8)], provide that the State

agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, *as well as any expenses reasonably attributable to the earning of any such income;*

42 U.S.C. § 602(a)(7) (1976) (emphasis supplied).

**8.** The work expense disregard was enacted in 1962. Public Welfare Amendments of 1962 § 106(b), Pub.L. No. 87–543, 76 Stat. 188 (1962).

bare language of section 402(a)(7)(A) provides scant basis for resolving the instant dispute. In pertinent part, section 402(a)(7)(A) provides:

A State plan for aid and services to needy families with children must ... except as may be otherwise provided in [section 402(a)(8)] ..., provide that the State agency ... shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid....

42 U.S.C. § 602(a)(7)(A). This language has remained virtually unchanged since its original enactment. Nowhere in the original Act, however, or in the amending acts of 1939, 1962, 1967, or 1981 (OBRA) is the term "income" explicitly defined.

█ This absence of intrinsic statutory definition has not, however, left the Court bereft of interpretational guidelines. The long history of the language in dispute has provided several bodies of secondary material which serve amply to indicate the intent of Congress as to the treatment to be accorded mandatory payroll deductions. The first such body of material is the collection of legislative and administrative materials which evidence the intention of the 76th Congress when it authored the language in question in 1939. This material is supplemented by administrative interpretations of the disputed language from 1939 to 1981. These pre-1981 materials not only serve to indicate the construction given the term "income" as used in section 402(a)(7)(A) over its more than forty-year history, but also constitute the definitional backdrop that informed the 97th Congress when it amended subchapter IV–A in 1981. The final useful body of material is that produced by the 97th Congress itself in 1981. The drafters of OBRA were explicit as to both their general policies in amending subchapter IV–A and their specific purposes in replacing the individualized work expense disregard with a flat $75 disregard. When coupled with the long-standing interpretation of "income" as not including mandatory payroll deductions, the 1981 legislative history of OBRA provides conclusive support for the position espoused here by plaintiffs.

### A. Pre-1981 Legislative and Administrative History

Since the original enactment of the AFDC program in 1935, as Title IV of the Social Security Act, Pub.L. No. 74–271, 49 Stat. 620 (1935), participant states have been required to establish a minimum dollar amount considered necessary to provide for the essential needs of an AFDC recipient family of any given size. Prior to 1939, each recipient family received benefits equal to this entire "standard of need," regardless of whether or not the family derived income from non-AFDC sources. This failure to consider outside income created the possibility that a recipient family with an employed member could realize an income in excess of its state's standard of need. Congress eliminated this possibility in 1939 by enacting section 402(a)(7) of the Social Security Act, which provided, as it still does, that "the State agency shall, in determining need, take into consideration any [non-AFDC] income and resources of any child claiming [AFDC]." See Social Security Act Amendments of 1939 § 401(b), Pub.L. No. 76–379, 53 Stat. 1360, 1379–80 (1939).

Despite the addition of several income "disregards" over the years, now codified in section 402(a)(8)(A), the language now in section 402(a)(7)(A) upon which the instant dispute focuses has remained unchanged since its original inclusion in the Social Security Act in 1939. It is the intent of the 76th Congress in 1939, therefore that is most relevant to an analysis of the disputed term "income" as used in section 402(a)(7)(A). As noted above, Congress' overriding concern in enacting the 1939 amendments to section 402(a) was to insure that the calculation of need under the

AFDC program genuinely reflected the income and resources available to recipient families. *See* H.R.Rep. No. 728, 76th Cong., 1st Sess. 29 (1939); *Guide to Public Assistance Administration* § 202 at 1.[9] As to the specific issue of the treatment of mandatory payroll deductions, the legislative history of the 1939 amendments is rather unilluminating.[10] Nonetheless, contemporaneous administrative interpretations of section 402(a)(7) by the Social Security Board, a predecessor to HHS as administering agency of AFDC,[11] are enlightening.

▆▆▆▆ Interpretations of section 402(a)(7) issued by the Social Security Board in 1939 and 1940 are particularly significant in light of the role played by the Board in the passage of the 1939 amendments. It was the Social Security Board that originally proposed, in January 1939, the legislation

that became the Social Security Amendments Act of 1939. H.R.Doc. No. 110, 76th Cong., 1st Sess. (1939) (presidential report to Congress transmitting Social Security Board's "Proposed Changes in the Social Security Act"). Shortly following the passage of the 1939 amendments, the Social Security Board issued a policy statement setting forth instructions to guide the states in implementing the new income-referencing requirement of section 402(a)(7).[12] The policy statement, issued prior to the effective date of the 1939 Amendments,[13] required that any "income" considered under section 402(a)(7) "shall actually exist," and "shall be available to the applicant. To be regarded as available, an income or resource must be actually on hand or ready for use when it is needed."[14] Two years

9. The testimony of the chairman of the Social Security Board, Arthur Altmeyer, during the 1939 House hearings indicates that in enacting Section 402(a)(7), Congress was confirming a Board policy already in effect. That policy was that only income actually received by a household should be considered in defining "needy" families under both the AFDC and Old Age Assistance (OAA) programs. In response to a question about the calculation of OAA benefits by the Social Security Board, Altmeyer responded in part:

> [W]e do require that the States take into account, in determining need, any contributions that relatives actually make to the support of a specific aged individual. There is a distinction between requiring that relatives support and requiring that when relatives do support a person that the actual amount of the support be taken into consideration.
> [Representative] Duncan: That, of course, goes directly to the question of the need of the applicant?
> Mr. Altmeyer: Yes sir.

*Hearings Relative to the Social Security Act Amendments of 1939*, 76th Cong., 1st Sess. 2254 (1939).

10. Mandatory payroll deductions for state and federal taxes were not yet made in 1939, although such deductions were made for FICA contributions. *See* Internal Revenue Code of 1939, § 1401(a), 26 U.S.C. § 1401(a) (1940). The deduction of federal income tax from paychecks as a mandatory payroll deduction was not instituted until 1943. *See* Act of June 9, 1943, ch. 120, 57 Stat. 126 (1943). The manner in which taxes are or were collected, however, does not bear on the following discussion of the Social Security Board's treatment of "income"

as only that portion of gross income which was actually available for support.

11. The Social Security Board was the federal agency charged with administering the AFDC program until 1946. At that time the task was taken over by the Federal Security Agency, which administered the program from 1946 until 1953. *See* Reorg. Plan No. 2 of 1946, *reprinted in* 5 U.S.C.A. app. at 176 (West 1967) *and in* 59 Stat. 613 (1946). The newly created Department of Health, Education and Welfare became the administering agency in 1953, *see* Reorg. Plan No. 1 of 1953, *reprinted in* 5 U.S. C.A. app. at 286 (West 1967) *and in* 67 Stat. 631 (1953). Finally, in 1979, the Department of Health, Education and Welfare was redesignated as the Department of Health and Human Services. *See* Dept. of Educ. Org. Act § 509, Pub.L. No. 96–88, 93 Stat. 668, 695 (1979).

12. Policy Statement of Social Security Board (Dec. 20, 1940), Plaintiffs' Exhibit D, Motion for Preliminary Injunction.

13. Section 402(a)(7) took effect on July 1, 1941.

14. In full, the quoted sections of the Social Security Board interpretation reads as follows:

> The policies and procedures adopted by the State agency shall be consistent with the following criteria for the consideration of income and resources in the determination of need:
> (a) The income or resource shall actually exist. Attributing a definite amount of income to sources or to kinds of property that produce either no income or less than the amount attributed to them is fictitious and

later the same criteria, spelled out more explicitly, were incorporated into the Social Security Board's *Guide to Public Assistance Administration*.[15] Coming from the agency charged with the AFDC program's administration, and virtually contemporaneous with the enactment of the language here in dispute, these constructions of statutory terminology are entitled to considerable deference. *United States v. Rutherford*, 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979); *Power Reactor Dev. Co. v. International Union of Elec., Radio and Mach. Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961); *Norwegian Nitrogen Prod. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). In addition, the deference to be accorded such an administrative interpretation is heightened when the construction at issue has remained consistent over a long period of time. *EEOC v. Associated Dry Goods Corp.*, 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); *NLRB v. Boeing Co.*, 412 U.S. 67, 74–75, 93 S.Ct. 1952, 1956–57, 36 L.Ed.2d 752 (1973).

In defining "income" as used in section 402(a)(7) over the last four decades, HHS and its predecessors have steadfastly adhered to the availability principle set forth by the Social Security Board in 1940.[16] Accordingly, the Court views the history of administrative interpretation of "income" as used in section 402(a)(7) as strongly supporting plaintiffs' position.

Defendant Heckler has attempted to contest this reading of the 1940 and 1942 Social Security Board directives and subsequent HHS regulations with a novel argument based on the recent district court holding in *Dickenson v. Petit*, 536 F.Supp. 1100 (D.Me.), *aff'd on other grounds*, 692 F.2d 177 (1st Cir.1982). According to the Secretary's argument, the concept of "availability" is meant to limit not the *amount* of income or resources that may be considered, but rather is to limit only the *sources* from which such income is to be recognized. Such a distinction is not only without support in the case law, but also flatly contra-

such an imputed amount cannot properly be considered as an actual resource.

(b) The income or resource shall be available to the applicant. To be regarded as available, an income or resource must be actually on hand or ready for use when it is needed. Consideration does not mean attributing a resources [sic] to sources from which income, contributions, maintenance, or support are not in fact available and forthcoming. Nor does it mean including as available for conversion to cash, ownership in real and personal property that is already meeting established requirements of the needy person or family.

Policy Statement of Social Security Board at 2 (Dec. 20, 1940).

**15.** The criteria recommended in the 1942 edition of the *Guide to Public Assistance Administration* for defining "income and resources" included:

1. Any income when considered in the determination of need should be real and not fictitious. Therefore, income should not be attributed to sources and kinds of property that produce no income or that are not meeting a requirement of the applicant. Neither should income be attributed in excess of the income actually produced or in excess of the benefit derived. In either case, such fictitious income at least complicates the process of determining need and in most instances

works an injustice and hardship upon the applicant.

2. The income or resource should be available to the applicant. To be regarded as available, an income or resource should be actually on hand or ready for use when it is needed. Consideration does not mean attributing a resource to sources from which income, contributions, maintenance, or support are not in fact available and forthcoming. Nor does it mean including as available for conversion to cash, ownership in real and personal property that is already meeting established requirements of the needy person or family.

*Guide to Public Assistance Administration* § 202 at 2 (May 22, 1942).

**16.** Such administrative interpretation has remained relevantly unchanged both up to and following the passage of OBRA. In 1981, for example, prior to the passage of OBRA, HHS regulations stated that in considering "income" as used in section 402(a)(7):

Net income available for current use and currently available resources shall be considered; income ... [is] considered available ... when actually available ... for support and maintenance.

45 C.F.R. § 233.20(a)(3)(ii)(D) (1981). Since the OBRA amendments, HHS has continued to define "income" as money actually available for support. *See infra* at 647–48.

dicts the administrative regulations that set forth the availability principle. The language in the *Guide to Public Assistance Administration* § 202 plainly addresses both sources "that produce no income" and sources that produce "less income than the amount attributed to them." *See supra* notes 14–15. The case law is equally contrary to defendant Heckler's reading. First, plaintiffs' position that the availability principle limits *both* sources and amounts of income is wholly consistent with cases which have applied the principle to include or exclude particular sources. Furthermore, the primary significance of the cases cited on this point by the Secretary is to demonstrate the lengthy and consistent vitality of the availability principle as a primary guidepost in defining "income and resources" under AFDC and related programs.[17]

The courts have repeatedly construed the "actually available" standard as set forth in the *Guide to Public Assistance Administration,* and later in the *Code of Federal Regulations,* to prohibit the attribution of a greater amount of "income" to a particular source than that source actually makes available. The court in *Reyna v. Vowell,* 470 F.2d 494, 497 (5th Cir.1972), held that under section 402(a)(7) a state could consider "only the amount of actual contributions" made by an employed child to an AFDC household. In *Barrons v. Saucier,* Civ. No. 17,159 (N.D.Ga.1973), *vacated as moot,* 496 F.2d 1187 (5th Cir.1974), the court held that the regulatory requirement that income be "actually available" barred a

---

17. *See, e.g., Van Lare v. Hurley,* 421 U.S. 338, 346–47, 95 S.Ct. 1741, 1746–47, 44 L.Ed.2d 208 (1975); *Shea v. Vialpando,* 416 U.S. 251, 261–66, 94 S.Ct. 1746, 1754–56, 40 L.Ed.2d 120 (1974); *King v. Smith,* 392 U.S. 309, 319–20, 88 S.Ct. 2128, 2134–35, 20 L.Ed.2d 1118 (1968); *Solman v. Shapiro,* 300 F.Supp. 409 (D.Conn.), *aff'd mem.,* 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969).

Despite the Supreme Court's emphasis on the availability principle in *Shea v. Vialpando,* the Secretary has attempted to discern significant support for her position in *obiter dicta* found in that case. *See also Dickenson v. Petit, supra,* 536 F.Supp. at 1110–15. In *Shea v. Vialpando,* the Supreme Court faced the question of whether the State of Colorado could, under section 402(a)(7) as written prior to OBRA, limit all disregarded employment expenses excluding child care to a flat $30 per month. Child care expenses and mandatory payroll deductions continued to be calculated on an individualized basis. Defendants' cite several portions of Justice Powell's opinion for the Supreme Court as supportive of their position that mandatory payroll deductions were considered to be work expenses prior to the passage of OBRA. The language from *Shea v. Vialpando* cited by defendants is of two types. The first is the use of the terms "total income" and "gross income" by Justice Powell to describe income from which work expenses had not been disregarded. For example, at one point Justice Powell observes, "expenses attributable to the earning of income . . . reduce the level of actually available income, and if not deducted from gross income will not produce a corresponding increase in AFDC assistance." 416 U.S. at 264, 94 S.Ct. at 1755. Plainly, however, Justice Powell is not addressing nor even alluding to mandatory payroll deductions. Rather, he is addressing the importance of the availability principle in construing section 402(a)(7). The terms "gross income" and "total income" are used simply as a means of distinguishing income before work expenses have been disregarded from income after such expenses have been disregarded. Defendants also emphasize the following language:

> [W]hile Colorado continued to allow individualized treatment of mandatory payroll deductions and child care costs, all other work-related expenses were subjected to a uniform allowance of $30 . . . .

> According to HEW, 20 States . . . presently employ a standard work-expense allowance in combination with actual child care expenses, and in some cases mandatory payroll deductions . . . .

416 U.S. at 255 n. 3, 94 S.Ct. at 1751 n. 3.

This Court discerns no reason to attach significance to any real or imagined assumptions as to the treatment of mandatory payroll deductions which may lurk in the language of *Shea v. Vialpando.* First, it is not at all clear that the quotations cited by defendants assume that mandatory payroll deductions are a work expense encompassed by section 402(a)(7) as written prior to OBRA. Second, even if the statements did contain such assumptions, they would represent sheer *obiter dicta,* unrelated to the matter being adjudicated in *Shea v. Vialpando.* Third, they would not even be illuminating *dicta.* In 1974, the issue of whether mandatory payroll deductions were "income" which was disregarded, or simply not "income" at all, was arithmetically vacuous. The issue facing this Court today was neither before the Supreme Court in *Shea v. Vialpando,* nor germane to the analysis in that case.

state from considering as income the average amount of child support contributed to an AFDC household in the prior six months, rather than the actual amount contributed in the month for which AFDC eligibility was being determined.[18] In *National Welfare Rights Org. v. Mathews*, 533 F.2d 637, 646–48 (D.C.Cir.1976), the court applied the availability principle to limit the amount of "resources," rather than "income," which could be considered under section 402(a)(7). The court held that the Secretary's regulations, which considered the market value rather than the equity value of a home, were contrary to the statute.[19] *See also Green v. Barnes*, 485 F.2d 242 (10th Cir. 1973) (precursor to 45 C.F.R. § 233.-20(a)(3)(ii)(d) prohibited states from considering market value rather than equity value in determining family's "resources").

Administrative regulations construing the term "income" as used in section 402(a)(7) have been buttressed, since at least 1957, by wholly consistent administrative definition of the term "work expense." The definition of work expenses articulated by the Department of Health, Education

and Welfare ("HEW"), both before and after the work expense disregard was formally codified in 1962,[20] makes plain that mandatory payroll deductions were not to be included among disregarded work expenses. Evidence that disregarded "work expenses" did not include mandatory payroll deductions directly supports plaintiffs' position that such deductions were not a part of "income," since defendants concede that prior to 1981 mandatory payroll deductions were not included in the net income, after disregards, used to calculate a family's AFDC benefits.[21]

As with the 1939 amendments, the work expense disregard was codified only after its use had been recommended to the states for several years by the federal agency administering AFDC, which in 1962 was HEW. Work expenses were defined by HEW in the *Handbook of Public Assistance Administration* (the "*Handbook*"), the publication which contained official administrative guidelines for the AFDC program from the early 1940's until the codification of AFDC guidelines in the *Code of Federal Regulations* in the late 1960's.[22] Work ex-

**18.** Several state courts have also faced the very issue, in different contexts, that is before this Court today. Each has concluded that when "income" is defined as including only income that is "actually available," it does not include mandatory payroll deductions. In *Harbolic v. Berger*, 43 N.Y.2d 102, 371 N.E.2d 499, 400 N.Y.S.2d 780 (1977), the New York Court of Appeals faced a statutory scheme for calculating state public assistance benefits closely akin to the AFDC formula. The court rejected a treatment of mandatory payroll deductions as "expenses necessary and incident to [the recipient's] employment," holding that such treatment by the administering agency violated the statutory requirement that "income" be "available to the applicant." Virtually the same result was reached in *Dumbleton v. Reed*, 40 N.Y.2d 586, 357 N.E.2d 363, 388 N.Y.S.2d 893 (1976). In *Dumbleton*, however, the issue was limited to the treatment of FICA deductions in calculating benefits for medical care. In *Watson v. Pennsylvania Dept. of Pub. Welfare*, 42 Pa.Commw. 181, 400 A.2d 669 (1979), the Commonwealth Court of Pennsylvania rejected the argument of the Pennsylvania Department of Public Welfare that mandatory payroll deductions were to be regarded, in calculating state General Assistance benefits, as an "expense reasonably attributable to the earning of income." The court held that such treatment

violated a Pennsylvania statute that required that "income must be actually available for current use."

**19.** The principle of considering equity value rather than fair market value of resources was explicitly adopted by Congress in OBRA at section 2302, 95 Stat. 357, 844–45 (1981). The accompanying Senate Report cites the holding in *National Welfare Rights Org. v. Mathews* with approval. S.Rep. No. 139, 97th Cong., 1st Sess. at 503, *reprinted in* 1981 U.S.Code Cong. & Ad.News 396, 769–70.

**20.** Public Welfare Amendments of 1962, Pub.L. No. 87–543, 76 Stat. 188 (1962).

**21.** The proposition that the definition of "work expense" supports plaintiffs' position of course assumes that one rejects, as does the Court, defendants' argument that the 97th Congress intended to amend the statutory definition of "income" as used in section 402(a)(7) without explicitly saying so. As explained *infra*, the Court can discern no persuasive evidence in support of that contention.

**22.** The courts have frequently relied on the *Handbook of Public Assistance Administration* as the primary source for official administra-

penses are defined in section 3140 of the *Handbook,* and plaintiffs have introduced four versions of that section, respectively dated 1957, 1962, 1963 and 1964. Plaintiffs' Exhibits B–E, Motion for Summary Judgment. Section 3140 of the *Handbook* includes a list of items that may be considered by administering state agencies to be expenses of employment. In 1957 and again in June 1962, prior to the formal enactment of the "work expense disregard," the *Handbook* provided, under the heading "Employment Expenses:"

> A State public assistance agency may establish a reasonable minimum money amount to represent the combined additional cost of three items—food, clothing, and personal incidentals—for all employed persons. The State plan may provide that other items of work expense will be allowed when there is a determination that such expenses do, in fact, exist in the individual case.

In 1963, Section 3140 was amended to comport with the newly enacted work expense disregard. Section 3140 retained the emphasis on "food, clothing, and personal incidentals," but now added a long and detailed list of items which could be considered among "other expenses." [23] That list included the cost of uniforms, transportation, collections for employee benefits, tools, licenses, union or other dues, education, publications, child care, and protective clothing. Nowhere on that list is there any mention of, or allusion to, mandatory payroll deductions.

The absence in this *Handbook* list of any mention of mandatory payroll deductions is glaring. Defendants have responded to this absence with the wan observation that the *Handbook* list is not intended to be exhaustive. Defendants' argument, however, that mandatory payroll deductions were meant to be included among "work expenses" but were simply not enumerated in the *Handbook of Public Assistance Administration,* is singularly unpersuasive. For most families with an employed member, mandatory payroll deductions would apparently entail more money than any item listed in section 3140. Indeed, the figures available to the Court indicate that mandatory payroll deductions may often be nearly equal in amount to the total of all section 3140 employment expenses combined.[24] It is unimaginable that so significant an item would have been left out of section 3140 if, as defendants contend, mandatory payroll deductions were being treated as "employment expenses." [25] Since defendants have conceded that, in the years 1962–1981, mandatory payroll deductions were not among the net post-disregard income being subtracted from recipient families' standards

---

tive interpretation of the Social Security Act. *See, e.g., Shea v. Vialpando, supra,* 416 U.S. at 259 n. 8, 262 n. 11, 94 S.Ct. at 1753 n. 8, 1754 n. 11; *King v. Smith, supra,* 392 U.S. at 316–33, 88 S.Ct. at 2132–41; *National Welfare Rights Org. v. Mathews, supra,* 533 F.2d at 643.

**23.** A similar list was included in the 1964 additions to the *Handbook.* Like the lists which followed in later editions of the *Handbook,* the 1964 list is quite detailed but makes no mention of mandatory payroll deductions.

**24.** Plaintiff Hagler, for example, has gross earnings of $704.00 per month, and three dependent children. Consequently, her mandatory payroll deductions total $84.42 per month. Her work expenses as enumerated in section 3140, exclusive of the costs of child care, total $97.35 per month. *See* Plaintiffs' Memorandum of Law, Motion for Preliminary Injunction, App. 2. The size of Hagler's mandatory payroll deductions are within two dollars of those for a

family of four with earnings at the non-farm poverty level, and virtually identical to those for a two-member family in which one member earns the minimum wage. *Id.,* App. 3. *See also Turner v. Woods, supra,* 559 F.Supp. at 614 (statistics compiled by State of California indicate that in 1980 average California recipient family with employed member paid $83.00 in mandatory payroll deductions and $80.00 for work expenses exclusive of child care).

**25.** Additional releases and regulations issued by HEW in the 1970's, addressing both "income" and "work expenses," attest to the fact that agency construction of those terms remained relevantly unchanged through 1981. *See, e.g.* Plaintiffs' Exhibit G, Motion for Summary Judgment (HEW memorandum to administering state agencies entitled "Program Instruction," Apr. 2, 1974); *see also Turner v. Woods, supra,* 559 F.Supp. at 612 (citing HEW internal memoranda of Apr. 3, 1972 and Mar. 22, 1978).

of need, the conclusion that mandatory payroll deductions were simply not part of "income" under 402(a)(7) prior to the passage of OBRA is inescapable.

Despite the considerable evidence documenting official Social Security Board, HEW, and HHS interpretations of "income" as used in section 402(a)(7), the Secretary now contends that the Court should nevertheless look to the practices of administering state agencies during the 1970's, which the Secretary claims support defendants' position. The Secretary argues that the prevailing practice among state agencies during the 1970's was to treat mandatory payroll deductions as part of "income," but to disregard such deductions as an expense of employment. The Court first notes the peripheral nature of such an argument. The legislative and administrative materials available strongly support plaintiffs' position that neither Congress nor HHS and its predecessors have ever considered "income" as used in section 402(a)(7)(A) to include mandatory payroll deductions. Even if some number of administering state agencies had misconstrued the terms of the statute, in a manner which had no effect on the amount of benefits paid, their erroneous practice would be scant basis for concluding that the meaning of statutory terms should be read in a new light. Furthermore, the evidence cited by the Secretary only tangentially supports her contention. In the years following the 1962 enactment of the work expense disregard, and particularly in the years following the decision in *Shea v. Vialpando,* 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), which required that state work expense disregards be individualized to reflect actual expenses, many states came to list mandatory payroll deductions among "work expenses" on the forms used in computing recipient grants. *See* HEW Internal Memorandum, Attachment b (Chart) (Feb. 1,

1972), Defendants' Exhibit No. 3. However, as pointed out by Judge Henderson in *Turner v. Woods, supra,* 559 F.Supp. at 612–13, this bureaucratic practice hardly supports the weight of defendants' argument. For states itemizing work expenses, there was no practical reason to distinguish on computation forms between items that were disregarded because they were not part of income and those that were disregarded because they were work expenses.

Among states that did not itemize work expenses, furthermore, the treatment of mandatory payroll deductions runs strongly counter to the Secretary's contention. In February 1972, for example, fifteen states used a standard deduction for work expenses other than child care, akin to the standard deduction now codified by OBRA at section 402(a)(8)(A)(ii) of the Act. *See* HEW Internal Memorandum, Attachment b (Chart) (Feb. 1, 1972), Defendants' Exhibit No. 3. Twelve of those fifteen states required that mandatory payroll deductions be itemized separately from and in addition to the state's standard deduction in determining the amount of income considered in determining need. *Id.* Additional data provided by the Secretary indicates that in 1978 state practice remained similarly unsupportive of defendants' position.[26] While state practice during the 1970's was not entirely uniform, it runs counter, as a whole, to the contention that the states ceased in the 1970's to differentiate between mandatory payroll deductions and work expenses.

### B. *The 1981 Amendments*

Taken together, the various legislative and administrative documents before the Court represent strong and consistent evidence as to the treatment of mandatory payroll deductions under the AFDC program during the years 1939 to 1981. Throughout that period, the agencies consecutively charged with administering the

---

**26.** In 1978, thirty-four states (counting the District of Columbia) apparently used a standard deduction for work expenses other than child care. HEW Internal Memorandum (Mar. 22, 1978), Defendants' Exhibit No. 5. Half of those states required the separate itemization of

mandatory payroll deductions. Among the seventeen states that did not provide for such separate itemization in addition to a standard deduction, all permitted the deduction of actual work expenses and mandatory payroll deductions in lieu of the standard deduction. *Id.*

program interpreted the term "income" as used in section 402(a)(7) as not including mandatory payroll deductions. The Court now turns to defendants' second general contention: that even if "income" as used in section 402(a)(7) did not include mandatory payroll deductions prior to the passage of OBRA, the meaning of the statutory term was changed by the 1981 amendments.

Defendants' arguments as to the 1981 amendments to section 402(a)(7) are twofold. First, defendants contend that whatever the definition of "income" as used in that section prior to 1981, the legislative history of OBRA indicates that the 97th Congress intended the term to encompass mandatory payroll deductions. Second, defendants argue that this is the construction that HHS, as administering agency, has placed on section 402(a)(7) as amended, and that this Court is therefore obligated to defer to that administrative construction. Ancillary to both of these positions is defendants' contention that the inclusion *vel non* of mandatory payroll deductions is to be controlled not by section 402(a)(7)(A), which provides that non-AFDC income shall be considered in calculating benefits, but by section 402(a)(8), which provides for various income disregards. The Court finds defendants' contentions as to the 1981 amendments to be unpersuasive.

### 1. *1981 Legislative History*

The Court has discussed above the considerations that lead it to conclude that the term "income" as used in section 402(a)(7)(A) was not intended, when enacted in 1939, to encompass mandatory payroll deductions. The Court has also addressed the lack of indication of any change in that definition in the period from 1939 to 1981, during which the term was consistently construed by the federal administering agencies as not including mandatory payroll de-

ductions. The Court now turns to defendants' unusual contention that, while the 97th Congress did not amend the language of section 402(a)(7)(A) now in dispute, Congress intended to significantly change the definition of the term "income" as used therein.

In its previous opinion in this case the Court noted that, because the language in dispute was authored in 1939 by the 76th Congress, the intent of the 97th Congress is a less illuminating guide to construction of section 402(a)(7)(A) than is the intent of the 76th Congress. *See RAM v. Blum, supra,* 533 F.Supp. at 947. Ultimately, however, the question of how much weight to accord the intent of the 97th Congress is not of consequence, because the evidence does not support defendants' contention that the intent of the 97th Congress was relevantly at odds with that of the 76th Congress.

The Secretary has relied on two congressional committee reports as supportive of her position that the 97th Congress intended to amend "income" as used in section 402(a)(7)(A) to encompass mandatory payroll deductions.[27] S.Rep. No. 139, 97th Cong., 1st Sess. 501–21, *reprinted in* 1981 U.S.Code Cong. & Ad.News, 396, 767–87; H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 978–85, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1010, 1340–47. Except insofar as the House Conference Report makes clear that the 97th Congress did not use the terms "income" and "earned income" interchangeably, *see infra* note 34, neither of these reports directly addresses the instant dispute.[28] One aspect of these legislative materials, however, is extremely noteworthy. That is the various discussions of the policy considerations underlying the OBRA changes in AFDC. Two sets of policy considerations are advanced by the 97th Congress as motivating the 1981 changes. The

---

**27.** In the alternative, of course, defendants' position is that "income" as used in section 402(a)(7)(A) has encompassed mandatory payroll deductions since 1939. Since the Court has rejected that position, however, the OBRA legislative history is relevant only as to whether it indicates a Congressional intent to alter the definition of "income" as used in that section.

**28.** While plaintiffs and defendants have both culled selected language from these reports to support their respective positions, that language generally cannot, when considered as a whole, support the various inferences attributed to it.

first consists of the particular administrative problems associated with the individualized work expense disregard, which the new standardized $75 disregard of section 402(a)(8)(A)(ii) are intended to ameliorate. The second is the broad policy objective of creating incentives to AFDC recipient families to obtain employment in lieu of continued reliance on AFDC benefits. This objective is a dominant theme not only in the congressional discussions of income disregards, but also throughout discussions of general changes in the AFDC program.

The Senate Report accompanying OBRA contains a clear and concise articulation of Congress's view of the administrative advantages of a standardized $75 work expense disregard. That articulation appears amidst a section-by-section comparison of the AFDC program before and after the OBRA amendments. The paragraph devoted to the standardized $75 work expense disregard explains:

> Because Federal law neither defines nor limits what may be considered a work-related expense, there is now great variation among the States and many instances of abuse. In addition, the requirement for itemization of individual work expenses has resulted in administrative complexity and error. It is the committee's belief that the change in the law with respect to work expenses would have the effect of limiting abuse of the work expense disregard and also result in simpler and more accurate determination of benefits.

S.Rep. No. 139, *supra,* at 501–02, U.S.Code Cong. & Admin.News, p. 768. Congress's explication here of its purpose is difficult to reconcile with the Secretary's argument that the 97th Congress intended to expand the rubric of "income" as used in section 402(a)(7)(A) to include mandatory payroll deductions. The amounts represented by such deductions are singular examples of amounts that are *not* subject to falsification, and are *not* difficult for the states to calculate. Indeed, the congressional aim of eliminating variation among the states would be directly frustrated by considering payroll deductions for state and local taxes to be part of "income."

Equally as significant as Congress's discussion of its particular aims in replacing the work expense disregard with a flat $75 disregard are Congress's broad policy objectives in amending the AFDC program in general in 1981. Central among these objectives is Congress's intention to encourage members of AFDC recipient families to obtain employment that will reduce or eliminate their dependence on AFDC. This congressional policy is not only repeatedly referred to in both legislative reports cited by defendants, but also served as the central basis for the creation of three new programs under AFDC, which are devoted to encouraging employment as an alternative to AFDC.[29] In light of this policy, defendants' arguments appear markedly contrary to congressional intent. Defendants' construction of section 402(a) would build into the AFDC program a significant disincentive for AFDC recipient families to obtain gainful employment. AFDC payments are not subject to mandatory payroll deductions. A family with no working member therefore has available for its support the entire amount set by the State of New York as the "standard of need." Under defendants' construction, however, the obtaining of employment would significantly reduce a family's take-home income.[30] In-

---

**29.** *See* OBRA §§ 2307–09, 95 Stat. 357, 846–48 (1981); S.Rep. No. 139, *supra,* at 501–03, 507–12; H.R.Conf.Rep. No. 208, *supra,* at 978–81.

**30.** The Court does not have figures available to accurately ascertain, for the average class member, the magnitude of this loss of income available for support, but it is clear that the loss would be quite significant. Affidavits sworn by plaintiff Hagler and two non-named class members indicate that the $75 disregard would often not offset expenses associated with employment, even when mandatory payroll deductions are not included. *See* Plaintiffs' Memorandum, Motion for Preliminary Injunction, App. 2 (Hagler incurs $97.35 per month in employment expenses, exclusive of child care and mandatory payroll deductions); Affidavit of class member Musu McClinton (incurs $62.40 per month); Affidavit of class member Mildred Solomon (incurs $72.98 per month); *see also Turner v. Woods, supra,* 559 F.Supp.

deed, even a raise in salary, so long as net pay did not exceed the family's standard of need, would result only in that family's paying higher taxes. Their AFDC benefits would be reduced by the same amount as the increase in gross salary, and their income available for support would be further reduced. Such a disincentive would be both significant and widespread, *see supra* note 30, and is flatly inconsistent with broad purposes expressed by Congress in passing the 1981 amendments to the AFDC program.

■ It scarcely bears repeating that a court faced with a problem of statutory construction should interpret the statute at issue in light of the purposes that Congress sought to serve by its enactment. *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *Philbrook v. Glodgett,* 421 U.S. 707, 713–14, 95 S.Ct. 1893, 1898–99, 44 L.Ed.2d 525 (1975). Both of the sets of policy considerations put forth by the 97th Congress in articulating the purposes of the 1981 amendments to the AFDC program strongly favor the conclusion that Congress did not intend in 1981 to bring mandatory payroll deductions within the definition of "income" as used in 402(a)(7)(A). The specific goals which motivated the adoption of a standardized $75 disregard, i.e. administrative ease, prevention of fraud, and state-to-state uniformity, are in no way advanced by defendants' interpretation. Indeed, the

goal of state-to-state uniformity is actually undercut. More importantly, the general aim of creating incentives to employment for AFDC recipients, so central to the OBRA amendments, is undermined. The Court cannot accept defendants' argument that Congress intended, *sub silentio,* to amend the definition of "income" as used in section 402(a)(7)(A) in a way that is so fundamentally at odds with the policy aims articulated in the legislative history.

### 2. HHS Materials

■ The Court turns finally to the administrative regulations promulgated by HHS since the passage of OBRA. Following OBRA's passage, HHS amended the section of the *Code of Federal Regulations* that explains the calculation of benefits under AFDC and other related financial assistance programs. 45 C.F.R. § 233.20. Of particular interest here is the section entitled "Income and Resources." 45 C.F.R. § 233.20(a)(3), *as amended by* 47 Fed.Reg. 5648, 5674–76 (Feb. 5, 1982). As have official administrative regulations since 1939, the new HHS regulations defining "income" for the purposes of determining need encompass only income *available* to recipient families for support. Specifically, the regulation in question provides:

> A State Plan for ... AFDC ... must ... [p]rovide that, in determining need and the amount of assistance payment, ... [n]et income ... and resources *avail-*

at 614 (average California AFDC recipient family with employed member incurred $80 in work expenses in 1980, exclusive of cost of child care and mandatory payroll deductions). Consequently, the loss of income which these families would suffer as a result of employment, under defendants' construction, would include both the amount by which their work expenses exceeded $75 *and* the sum of their mandatory payroll deductions. *See supra* note 24. While work expenses may, as Congress intended, be subject to some reduction through economizing, mandatory payroll deductions plainly are not. In addition to the sheer size of the penalty that would accompany employment under defendants' construction, the penalty would be extremely widespread, affecting any recipient family that derives income from employment. Finally, the Court makes the obvious observation that the $75 figure established by Congress

is dramatically more commensurate with "work expenses" under plaintiffs' construction of that term than under defendants' construction. Defendants argue that such a reduction in AFDC benefits was intended by the 97th Congress for reasons of economy. However, a reduction in benefits similar in size to that proposed by defendants was embodied in the 1981 amendments to the work incentive disregard. OBRA § 2301, 95 Stat. 357, 843–44 (1981). When enacting that reduction, Congress took great care to discuss at length the reasons behind the change. *See, e.g.,* S.Rep. No. 139, *supra,* at 502–03. Defendants now argue, in effect, that the 97th Congress intended a comparable reduction, by excluding mandatory payroll deductions from "income," but chose neither to discuss those intentions nor to make them plain.

*able for current use* shall be considered; income and resources are considered available both when *actually available* and when the applicant or recipient has a legal interest in a liquidated sum and has the legal ability to make such sum available *for support and maintenance.*

45 C.F.R. § 233.20(a)(3)(ii)(D), *as amended by* 47 Fed.Reg. 5648, 5675 (Feb. 5, 1982) (emphasis supplied). As noted above, this administrative definition of "income" as used in section 402(a)(7)(A) has remained virtually unchanged since 1939. Furthermore, HHS and its predecessors have recognized since 1939 that the availability requirement dictates that mandatory payroll deductions, which plainly are not available for current use, are not to be included among "income" as used in section 402(a)(7)(A).[31] As this Court noted in granting plaintiffs' motion for a preliminary injunction, the longevity of this interpretation, and the consistency with which it has been interpreted, entitle this regulation to considerable deference. *RAM v. Blum, supra,* 533 F.Supp. at 941–43; *see also supra* p. 640.

The Secretary attempts to suggest that the above-quoted regulation is inapplicable. As noted in this Court's opinion issuing the preliminary injunction, the Secretary's reasoning here is obscure and unconvincing. *See RAM v. Blum, supra,* 533 F.Supp. at 942–43. Basically, the Secretary contends that the subsection in question is "more general" than certain other subsections in the regulations that she contends also apply to section 402(a)(7)(A) and contain differing definitions of "income." *See, e.g.,* 45 C.F.R. §§ 233.20(a)(6)(iv), 233.20(a)(7)(i); *see also Handbook of Public Assistance Administration, supra,* § 3162. In essence, the Secretary's arguments as to the appropriate reading of the regulations contained in 45 C.F.R. § 233.20 are no more than a reiteration of her contention that the treatment of mandatory payroll deductions should be governed not by section 402(a)(7)(A) of the Act, but by section 402(a)(8). The subsections of 45 C.F.R. § 233.20 cited by the Secretary unambiguously apply to section 402(a)(8) of the Act, and not to section 402(a)(7)(A). By their very terms, those subsections establish the method for calculating the disregards from "earned income" set out in section 402(a)(8).[32] As discussed

---

**31.** Outside the context of this litigation, HHS itself has recognized that the definition of "income and resources" as used in section 402(a)(7)(A) is unchanged by the OBRA amendments. See, for example, the commentary by HHS accompanying the 1982 amendments to 42 C.F.R. Part 233:

> *Comment:* One of the comments asked for a definition of "currently available" when applied to evaluating resources.
> *Response:* The existing regulation at § 233.20(a)(3)(ii)(D) gives a clear statement of what "currently available" means, and is unchanged by [OBRA].

47 Fed.Reg. 5648, 5657 (Feb. 5, 1982) ("Discussion of Major Provisions and Response to Comments"). *See also* HHS Internal Memorandum at 5 (Sept. 11, 1981) (addressed to state administrators):

> *Earned Income Disregards*
> \* \* \* \* \* \*
> 4. Q. Will income be redefined in the new regulations.
> A. No, for purposes of the rulemaking, *the income definitions not specifically addressed by [OBRA] remain unchanged.*

The Secretary's argument that "income" as used in section 402(a)(7)(A) includes mandatory payroll deductions is in fact simply a reitera-

tion of her contention that the availability principle has never limited *amounts* of income to be considered, but only *sources* of income. The lack of support for such a position is addressed by this Court *supra* at pp. 640–42.

**32.** It is noteworthy that 45 C.F.R. § 233.20(a)(6)(iv), upon which defendants place primary emphasis, was not adopted until after the 1967 Amendments to the AFDC program, which enacted the "work incentive disregard," now codified in amended form at section 402(a)(8)(A)(iv). *See supra* note 6. The inclusion of mandatory payroll deductions within "earned income" as used in section 402(a)(8), even though such deductions were not included in "income" under section 402(a)(7), appears to have been motivated by congressional desire in 1967 to maximize the employment incentive to recipient families. *See Connecticut State Dept. of Pub. Welfare v. HEW,* 448 F.2d 209, 214–15 (2d Cir.1971).

Furthermore, even if the Court were of the view that § 233.20(a)(6)(iv) conflicts with the long-standing availability principle of § 233.20(a)(3)(ii)(D), it would rely on the latter subsection. It is that regulation that construes the statutory section at issue in this proceeding. Contradictory regulations interpreting other

by the Court at length in its order issuing the preliminary injunction in this case, definitions of the terms employed in section 402(a)(8) of the Act simply do not address the issue before the Court. The Court today is charged with scrutinizing the first step of the three-step process of calculating AFDC benefits, as described *supra* at pp. 636–37.[33] In that first step, a family's "income and resources" are established in accordance with section 402(a)(7)(A). In contrast, section 402(a)(8) sets forth the second step of the process, whereby various income disregards are applied. As the language of section 402(a)(7)(A) makes plain, the disregards established in section 402(a)(8) are to be used only as modifications to the amount of "income and resources" considered under section 402(a)(7)(A).

Since the subsections of 45 C.F.R. § 233.-20 championed by the Secretary plainly refer not to section 402(a)(7)(A) but to section 402(a)(8), there is no merit to the argument that those subsections should be relied upon instead of 45 C.F.R. § 233.20(a)(3)(ii)(D). Furthermore, the subsections at issue are not inconsistent with the Court's reading of 45 C.F.R. § 233.20(a)(3)(ii)(D). Nowhere do 45 C.F.R. §§ 233.20(a)(6) or 233.20(a)(7), contain language that could be construed as a definition of "income" as used in section

402(a)(7)(A). The regulations relied upon by the Secretary apply only to the term "earned income" as used in section 402(a)(8). While the terms "income" and "earned income" are not unrelated, the Court has noted the lack of support for Secretary's position that they are to be construed identically.[34] *See RAM v. Blum,* 533 F.Supp. 947–48.

 The Court once again recognizes that the interpretation it adopts of the HHS regulations at issue is not the interpretation urged by the Secretary. In so doing, the Court is cognizant of the principle that an agency's interpretation of its own regulations is to be accorded great deference by a reviewing Court.[35] *Ballard v. Rockville Centre Housing Authority,* 605 F.2d 1283, 1286 (2d Cir.1979); *United States v. Goldberg,* 527 F.2d 165, 172 (2d Cir.1975), *cert. denied sub nom. Pocono Int'l Corp. v. United States,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Such an interpretation may be ignored, however, if it is plainly erroneous or if it is inconsistent with the regulation being interpreted. *Shea v. Vialpando, supra,* 416 U.S. at 262 n. 11, 94 S.Ct. at 1754 n. 11 (rejecting HEW's construction of section 402(a)(7)); *Townsend v. Swank,* 404 U.S. 282, 286, 92 S.Ct. 502, 505, 30 L.Ed.2d 448 (1971) (rejecting HEW's con-

statutory sections would hardly present a basis, as agency interpretations, for deference by this Court. *See Turner v. Woods, supra,* 559 F. Supp. at 613–14.

**33.** The Court again notes that what it referred to as the second and third steps of a four-step process in its opinion issuing the preliminary injunction are more properly viewed, along with other disregards contained in section 402(a)(8), as part of the second step of a three-step process. *See supra* note 5.

**34.** Defendants basically suggest that the use of the terms "income" in section 402(a)(7)(A) and "earned income" in section 402(a)(8) is merely a piece of sloppy statutory drafting, and that there is no definitional distinction between the two terms. *See, e.g.,* Secretary's Memorandum of Law, Motion for Preliminary Injunction, at 5. While the Court acknowledges that Congress's use of the terms "income" and "earned income" has not always been a model of clarity, there is no merit to defendants' contention that the terms have been used interchangeably.

Such a contention is belied, for example, by H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 978–80, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1010, 1340–42. The cited pages of that report contain, *inter alia,* six sections addressing the AFDC program; two address "earned income," and four address "income." These sections contain relatively specific discussions of the arithmetical treatment to be accorded various calculations of income and disregards. The terms "income" and "earned income" are both discussed at some length, and at no point are they used synonymously or interchangeably.

**35.** The Court has previously noted its doubts as to whether the position taken by the Secretary in this litigation constitutes an official agency interpretation of the regulations at issue, thereby entitled to deference. *See RAM v. Blum, supra,* 533 F.Supp. at 943. Because the Secretary's position is inconsistent with the regulations, however, the issue of whether it is to be accorded deference does not affect the Court's decision to reject the Secretary's position.

struction of section 402(a)(10) as inconsistent with the Act); *Shepherd v. Merit Systems Protection Bd.,* 652 F.2d 1040, 1043 (D.C.Cir.1981); *Pratt & Whitney Aircraft v. Secretary of Labor,* 649 F.2d 96, 103 (2d Cir.1981) (interpretation must be consistent with enabling act under which it was promulgated); *Miller v. Bond,* 641 F.2d 997, 1002 (D.C.Cir.1981); *Foulkes v. Commissioner of Internal Revenue,* 638 F.2d 1105, 1110 n. 17 (7th Cir.1981); *Ruangswang v. INS,* 591 F.2d 39, 43 (9th Cir.1978). Faced with the unambiguous language of the regulations here at issue, the Court is forced to conclude that the interpretation advocated by the Secretary is plainly inconsistent with both the statute and the regulations. The Court's conclusion is bolstered by the fact that the Secretary's reading is inconsistent with longstanding construction by HHS, HEW and the Social Security Board of the regulatory language at issue. *See Shea v. Vialpando, supra,* 416 U.S. at 262 n. 11, 94 S.Ct. at 1754 n. 11 (rejecting HEW's construction of section 402(a)(7), noting that "HEW itself has not adhered to a uniform practice" in construing the section).

## CONCLUSION

For the reasons stated herein, the Court concludes that the statutory construction of section 402(a) of the Social Security Act advanced by defendants is inconsistent with the intent of both the 76th and 97th Congresses. Plaintiffs' position is supported by the legislative history, by long-standing administrative interpretation of the language in dispute, and by a clear articulation by the 97th Congress of its purposes in amending the AFDC program.

Accordingly, plaintiff's motion for summary judgment pursuant to Rule 56(a), Fed. R.Civ.P., is granted. Defendants Blum and Krauskopf are hereby permanently enjoined from calculating the amount of an eligible family's monthly AFDC grant by deeming mandatory payroll deductions to be "income" within the meaning of 42 U.S.C. § 602(a)(7)(A). The parties shall notify the Court within thirty (30) days of the date of this decision as to whether there are to be any further proceedings in this case.

Settle order on notice.